IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 27, 2001 Session

## STATE OF TENNESSEE v. CHRIS HAIRE

**Appeal from the Criminal Court for McMinn County**
**Nos. 98-103 & 98-103A      Carroll L. Ross, Judge**

**No. E2000-01636-CCA-R3-CD**
**January 22, 2002**

The defendant appeals from his McMinn County Criminal Court convictions and sentences for second degree murder and facilitation of attempted second degree murder. The trial court sentenced the defendant to 25 years in the Department of Correction as a Range I offender for the second degree murder conviction and to five years incarceration for the facilitation of attempted second degree murder conviction. In this direct appeal, the defendant complains that the evidence is insufficient; that photographs and expert testimony were improperly admitted; that prosecutorial misconduct taints the verdict; that the state improperly questioned the defendant about his post-arrest exercise of his right to remain silent; that the jury instructions regarding intoxication were prejudicially inadequate; and that the sentences imposed are excessive. Unpersuaded by the defendant's assignments of errors, we affirm the trial court's judgment and sentence.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ROBERT W. WEDEMEYER, JJ., joined.

Richard A. Fisher, Cleveland, Tennessee, for the appellant, Chris Haire.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; Jerry N. Estes, District Attorney General; and William Reedy, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises from the January 30, 1998 shooting death of 23-year old Michael Hite and the nonfatal shooting of 27-year old Mark Allen. The shootings occurred in the early morning hours at the trailer residence of Hite and Jeremy Stakley, located in McMinn County. The evidence is undisputed that the same .38 caliber revolver was used in both shootings. It is also uncontested that the defendant, Chris Haire, was Hite's assailant and that John Newberry was Allen's attacker.

The defendant and Newberry were charged with first degree, premeditated murder of Hite and with attempted first degree murder of Allen.

The defendant was tried in 1999 separately from Newberry.[1] The theory of defense with regard to the Hite shooting was that the defendant, who was 20 years old, was extremely intoxicated and that the revolver accidently discharged as the defendant was offering to show it to Hite. There were no eyewitnesses to that shooting, which occurred in Hite's bedroom inside the trailer. As for Allen, who was shot by Newberry outside the trailer in his Jeep vehicle, the defendant disavowed any knowledge of Newberry's intentions before the shooting and denied assisting Newberry. An integral part of the defense theory was that the victims and the assailants knew each other on a friendly basis, such that the defendant had no motive to harm Hite. According to the defense, Newberry and the defendant had gone to the trailer only to sell or trade the gun for marijuana.

Not surprisingly, the state's evidence and the defendant's evidence at trial sharply conflicted, particularly with regard to the defendant's purpose and motive in going to the trailer. Dee Dee Miller, who was a friend of the defendant and his wife, testified for the state about the defendant's actions and demeanor during the evening before the shooting. Miller and another friend, Ashley Cranfield, went to the defendant's residence around 12:00 midnight in response to a telephone call from Heather Haire, the defendant's wife. The defendant, Ms. Haire, and John Newberry were in the kitchen when Miller and Cranfield arrived. Miller testified that Ms. Haire was crying and that the defendant was yelling and cussing at her.

In Miller's opinion, the defendant was very intoxicated, and at one point the defendant confronted his wife and asked if she was "going with these f------ bitches." Miller took Ms. Haire downstairs to find shoes so the three women could leave. As Miller headed for the kitchen door, Newberry, who also appeared highly intoxicated, pulled a gun out of his pants. Miller inquired what he was doing with the gun; she also told him that he did not need the gun and expressed her concern that someone would get hurt. Newberry assured her that the gun was unloaded, but Miller prevailed upon him to allow her to take the gun and have Ms. Haire return it later. Ms. Haire left with Miller and Cranfield. Cranfield took Miller home, and Ms. Haire and Cranfield adjourned to Cranfield's house. Miller knew nothing about the shooting until around 7:00 a.m., when Cranfield called to tell her what had happened.

Ashley Cranfield, who also was a friend of the defendant and his wife, testified about the call from Ms. Haire requesting that Cranfield and Miller come get her. Ms. Haire was crying, and Cranfield could hear the defendant in the background yelling. Cranfield corroborated Miller's account of what happened at the Haire residence. The defendant seemed "very drunk" to Cranfield, and she could not get the defendant to explain why he was upset and yelling. She saw Newberry hand a gun to Miller as they were leaving. Later, at Cranfield's home, Ms. Haire received a telephone call. As a result of that conversation, Cranfield drove back to the Haire residence, where

---

[1] The record before us does not indicate the disposition of the charges against Newberry.

she returned the gun to Newberry. Cranfield again left, and the defendant's wife stayed with her that night.

The state called the defendant's wife, Heather Haire, to testify and was allowed to treat her as a hostile witness. Ms. Haire affirmed that she had no plans to divorce the defendant to whom she had been married for approximately two and one-half years. She denied that there were marital problems around the time of the shootings, but she had given a statement to the police shortly after the offenses in which she related that about two weeks before the shootings, her husband had accused her of having an affair with one of the victims, Mark Allen.

Ms. Haire offered a benign account of the evening's events. She testified that she was not feeling well that evening. Newberry came over to visit, and he and the defendant were drinking. The defendant had the radio turned up to a loud volume. Also, he was playing a Nintendo football game, which was causing him to curse. Ms. Haire testified that she wanted to leave because she could not get any rest, so she called Cranfield. The loud music was bothering her, and the defendant was getting on her nerves by tickling her and picking on her. She denied that the defendant was cursing her that evening, and she further denied that the defendant had ever threatened her.

Regarding the handgun, Ms. Haire testified that it belonged to Newberry. She had not known the defendant to carry a gun. She remembered that Newberry called Cranfield's house later asking for the gun to be returned. She denied that the defendant got on the phone and made the same demand for the gun. Newberry said that if they did not return the gun, he would come and get it. Cranfield did not want Newberry and/or the defendant to show up drunk at her house and perhaps wake up her mother. Therefore, Ms. Haire and Cranfield drove to the defendant's house with the gun; Ms. Haire waited in the car while Cranfield took the gun inside the house.

Turning to the scene of the shootings, the state's evidence showed that on the evening of January 29, numerous people had stopped by Hite's and Stakley's trailer to drink beer and visit. As the evening wore on, people started leaving, and Hite went to bed. Two of the guests, Mark Allen and Barry Wade, opted to stay and sleep on the sofa sleeper. Stakley was at work and was not expected back until later that morning.

Around 3:00 a.m. on January 30, Allen and Wade were awakened by pounding on the trailer door. Wade opened the door, and the defendant and Newberry entered. Both Allen and Wade testified that the defendant and Newberry appeared intoxicated but not hostile or threatening. The defendant wanted to know what time Stakley would be back, and Allen told him 7:30 or 8:00 a.m. The defendant had a gun with him. He showed it to Allen and wanted to know what Allen thought about it, but before Allen could examine the gun, the defendant put it back in his pocket.

Allen and Wade wanted to go back to sleep, but because the defendant and Newberry were there, Allen and Wade decided to dress and return to their homes. Before they could do so, Hite emerged from his bedroom and walked through on his way to use Stakley's bathroom; Hite's toilet apparently was broken at the time.

Hite spoke briefly to the defendant and to Newberry and returned to his bedroom. Allen testified that they watched television for awhile. At some point, Newberry asked the defendant, "Chris, you ready to G-O?" The defendant stood up, and as he attempted to walk he knocked over a lamp. The defendant tried to pick up the lamp and put it back, but he could not. Allen related that he finally helped the defendant pick up the lamp. The defendant then "stumbled" into the bathroom. When the defendant emerged he began pacing between the bathroom and Hite's bedroom. Allen and Wade began putting on their jeans to leave, and they heard a shot. Allen looked around a corner and saw the defendant with a gun. Allen testified that the defendant remarked, "What did I do?" and "I didn't do anything."

The witness accounts of what happened next are conflicting, but two more shots were discharged from the gun in the general direction of Allen and Wade. Wade ran into Stakley's bedroom to hide. Allen ran to the defendant and wrestled the defendant to the couch. Newberry retrieved the gun, and Allen got off the defendant. Allen checked on Hite. Hite was in bed and in a sleeping position on his stomach with his head turned to the left. Allen testified that Hite had been shot in the exposed, left side of his head and that Hite was dead.

Allen met up with Wade just outside the bedroom. Allen then walked up to Newberry, who was standing by one of the trailer doors, and told him that they needed to go get Allen's father. Allen then tried, but was unable, to open the door. Allen testified that when he looked out a window, he saw that the defendant was holding the door shut. The defendant eventually reentered the trailer, at which time Allen walked past Newberry and the defendant, exited the trailer, and headed for his Jeep. Allen got into his Jeep, but before he could close the vehicle door, Newberry ran up carrying a gun. Newberry wanted Allen to go back inside the trailer and "talk about what we're going to do." According to Allen, the defendant did not approach the Jeep. Rather, the defendant was outside "staggering around walking" about seven to ten feet away at the front left corner of the Jeep.

Allen rebuffed Newberry's suggestion to go back inside. Allen turned away and stuck his key in the Jeep's ignition, at which time he was shot in the head. Allen testified that he fell sideways into the passenger seat. He pretended to be dead until the defendant and Newberry drove away. Allen was able to get back inside the trailer, and he started looking for a phone. He found one in Hite's bedroom, but it was not in working order. Wade then found Allen, and Wade drove him to the hospital. Allen testified that before they left the trailer, they took some towels from Stakley's bathroom, and while in the bathroom, Allen removed a bag of marijuana from his pocket and dumped it in the commode. Allen admitted at trial that he never saw or heard the defendant, either inside or outside the trailer, do anything to promote or encourage Newberry to shoot him.

As part of its case, the state also elicited evidence from the county medical examiner, who performed the autopsy on Hite's body, and from McMinn County detectives who were involved with the arrest of the defendant and Newberry. Detective Fred Schultz was part of the team that went to the defendant's residence around 6:00 a.m. the same day of the shooting. He testified that the front door came open when the officers knocked. The officers entered and discovered Newberry and

the defendant in an upstairs bedroom stretched out on the bed. Detective Schultz testified that his first reaction was that the defendant was dead because he was "laying motionless on his back with his head resting on the pillow, with a, just a stare like he was either dead or in a coma." The defendant did not respond when given verbal commands or when a flashlight was shined in his eyes. Not until the officers physically removed the defendant from the bed did he awake, at which time he became verbally abusive.

Detective Schultz related that the defendant was escorted from the bedroom so that it could be searched. The defendant was taken into the hallway and seated in a chair. Another officer, Detective Jerry Wilson, had been assigned to take photographs. Detective Wilson testified that he noticed that the defendant was using a lot of foul language whenever anyone walked by in the hallway. Detective Wilson decided to snap a photograph of the defendant, and as he prepared to do so, the defendant looked up and grinned at the camera.

From his residence, the defendant was transported to the Athens Community Hospital. Blood drawn at 7:40 a.m. that morning was tested, and the defendant's blood alcohol content registered .20. Both the defendant and Newberry tested positive for gunshot residue on their hands.

Dr. Ronald Toolsie, who performed the autopsy on Hite's body, testified that Hite had sustained a single gunshot wound to the left upper scalp from an intermediate distance of a few inches to a foot. The wound was four to five inches above the ear and a couple of inches in front of it. Based on the path of the bullet, Dr. Toolsie stated that the weapon was discharged outside the victim's peripheral vision. In Dr. Toolsie's opinion, Hite's head was down on the bed in a sleeping position when he was shot. That position is reflected in the state's photograph of the body taken before anything was moved or disturbed. Dr. Toolsie conceded the possibility that Hite's head or chin could have been up and above the pillow when the gun discharged, but nonetheless, in his opinion, the shooting was a homicide, not an accident.

At the conclusion of the state's case, the defense presented brief testimony from several witnesses that the defendant is right handed and that his reputation for peacefulness and honesty is good. In addition, the defendant recalled his wife. She denied being afraid to leave the defendant and denied that he had threatened her. The state provided her a copy of her police statement on cross examination and read from it. Ms. Haire had recounted for the police several incidents prior to the shootings when the defendant had questioned her in an accusatory fashion about seeing other men. One time, for example, the defendant came home from work and asked her whose car had been parked behind their house. Another time, he demanded to know who had been at their house, why she had bagged up the garbage, and what she was hiding. When Ms. Haire professed not to know what he was talking about, he accused her of being with Mark Allen. In her statement, Ms. Haire told the police that she had "never been with Mark or with any of those at the trailer."

The most lengthy proof was the defendant's own testimony. He discussed his usual group of friends, which included the victims and the witnesses who had testified earlier. Of the

group, the defendant said that he was closest to Newberry because Newberry had lived with him at one time. Many of the people in the group drank alcohol and smoked marijuana.

The defendant's account of his activities earlier in the evening at his house was consistent with his wife's description. He added that he was highly intoxicated, having consumed beer, vodka, and tequila. The defendant admitted that he curses when he gets intoxicated. He could not recall cursing his wife, Miller, or Cranfield that night, but he conceded that he could have done so in his intoxicated condition. The defendant admitted that on one occasion, two to three weeks before the shootings, he had accused his wife of having an affair. When, however, she denied any such relationship, the defendant said that he dropped the subject.

The defendant testified that Newberry came up with the idea of selling the gun to Stakley so they could buy marijuana that evening. The defendant estimated that a quarter-bag of marijuana costs between $35 to $40. The defendant testified that he and Newberry had no money that evening, but a police photograph of the defendant's bedroom showed money on the floor beside the bed. The defendant said that the money belonged to Newberry and that he did not know that Newberry had any money that evening.

The defendant explained that he and Newberry went to the trailer because the defendant was a friend of Stakley and because Stakley would know where they could find marijuana. The defendant did not recall what time it was when he drove them to the trailer. He testified that he remembered knocking on the door, going inside, talking with Wade and Allen, drinking a couple of beers, and speaking briefly with Hite. He believed that he showed the gun to Wade and Allen.

The defendant disavowed any plan to kill Hite. He testified that he recalled going back to Hite's bedroom and having a conversation. Hite, he remembered, was in bed and propped up. The defendant asked Hite if he thought Stakley would be interested in buying the gun. The defendant testified, "And I remember having the gun and like, when I was handing it to him, I remember it going off." According to the defendant, "I never aimed the gun at him . . . never."

The defendant did not recall firing any other shots; he testified that the next thing he remembered was running and being tackled. From that point, the defendant's next memory was of being outside, wandering around dazed, and seeing Newberry at the Jeep talking to Allen. The defendant heard the gun discharge, and he headed in the direction of the sound. Newberry told him that Allen was dead, and Newberry grabbed him and told him to go. The defendant testified that he had "no idea" that Newberry was going to shoot Allen. The defendant and Newberry drove off, and along the way Newberry threw the gun out the passenger window.

The defendant testified that he did not recall being arrested. Likewise, he did not remember having his picture taken when he was sitting in the hallway of his house.

Based on the evidence, the jury returned a verdict finding the defendant guilty of second degree murder as a lesser-included offense of first degree murder in connection with Hite's

shooting and finding him guilty of facilitation of attempted second degree murder as a lesser-included offense of attempted first degree murder in connection with Allen's shooting. The trial court sentenced the defendant to 25 years for Hite's shooting and to five years for the facilitation of Allen's shooting.

## I. Sufficiency of the Evidence

The defendant complains that the state failed to prove beyond a reasonable doubt that he was guilty of second degree murder in connection with the Hite shooting. He further asserts that the evidence is insufficient to prove facilitation to commit attempted second degree murder in connection with the Allen shooting. As we shall explain, we respectfully disagree that the evidence is insufficient for either conviction.

### A. Standard of Review

When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational factfinder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

### B. Second Degree Murder of Michael Hite

Second degree murder is "[a] knowing killing of another," punishable as a Class A felony. Tenn. Code Ann. § 39-13-210 (1997). A "knowing" killing is one in which "the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-106(20) (1997); *see State v. Decker*, 27 S.W.3d 889, 896 (Tenn. 2000). The defendant in this case maintains that the "knowing" element of the offense was not proven beyond a reasonable doubt because the evidence at trial showed that he was extremely intoxicated such that the Hite shooting was an accident.

From the evidence in this case, viewed most favorably to the state, we conclude that the proof sufficiently supports a finding of second degree murder. By its verdict, the jury determined that the defendant did not premeditate the homicide of Hite. Therefore, the question was whether the shooting was "knowing" or was an accident. The jury heard the defendant's account of the events and his protestations that the shooting was an accident. The jury reasonably could conclude that the physical evidence refuted the defendant's claim that the victim was propped up on his right arm in the bed and was reaching up to take the gun when it accidently discharged. The jury, in addition, reasonably could believe that the additional shots fired, the defendant's departure from the trailer, his failure to contact medical or law enforcement personnel, and his return to his residence to sleep were inconsistent with an accidental shooting.

As for the reasons why the defendant went to the trailer, the jury reasonably could conclude that something other than a desire to sell the gun to buy marijuana was afoot. The state's evidence showed that Newberry had at least $20 that evening. Also, the jury reasonably could disbelieve the wife's tame version of the defendant's behavior and, instead, credit Miller's and Cranfield's account of what transpired. The defendant, moreover, admitted during his testimony that two or three weeks before the shootings he had accused his wife of having an affair.

The defendant argues that his voluntary intoxication prevented him from "knowingly" killing the victim. Although voluntary intoxication is not itself a defense to second degree murder, it is relevant to negate a culpable mental state. Tenn. Code Ann. § 39-11-503 (1997). In this case, the trial court properly charged the jury as to the relevance of voluntary intoxication. Whether a defendant is too intoxicated to form the requisite mental state is a question reserved for the jury. *State v. Brooks*, 909 S.W.2d 854, 859 (Tenn. Crim. App. 1995). The jury in this case obviously concluded that the defendant was not so intoxicated as to be unable to form the required mental state of "knowing." In the light most favorable to the state, this interpretation of the evidence is reasonable, and we will not disturb that determination.

The defendant's second degree murder insufficiency claim fails.

### *C. Facilitation of Attempted Second Degree Murder of Mark Allen*

A person is criminally responsible for the facilitation of a felony "if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (1997). With facilitation, the offender "though facilitating the offense, lacks the intent to promote, assist or benefit from the offense." *Id.*, Sentencing Comm'n Cmts.

The defendant challenges the evidence sufficiency for this conviction on two grounds. He claims that he had "no idea" that Newberry was going to shoot Allen and that he did not "assist"

-8-

Newberry in any way. The state counters that the proof showed that the defendant and Newberry had a plan to harm both Hite and Allen and that the defendant furnished substantial assistance to Newberry by trying to block Allen and Wade from escaping.

The state in this case offered circumstantial evidence from which the jury could reasonably conclude that the defendant, suspicious of his wife's involvement with Allen and fortified by alcohol, recruited Newberry to help him locate Allen. The defendant and Newberry embarked on this mission armed with a handgun from which the jury could deduce that the men intended to threaten or otherwise harm Allen.

The state's evidence does not explain how the defendant or Newberry knew that Allen was at Hite's and Stakley's trailer, but the evidence at trial indicated that the trailer was a popular gathering spot for the defendant's group of friends. Although we are skeptical that Newberry's question "Chris, you ready to G-O?" was some kind of code for "lock and load," such an interpretation is, nevertheless, a legitimate "inference" from the evidence.

The defendant's and Newberry's actions immediately following the shooting of Hite are particularly telling. The jury reasonably could credit Wade's testimony that after the first shot was fired he headed for cover in Stakley's bedroom, but Newberry stopped him, put his arm out, and announced, "I've got him." Likewise, the jury could reasonably accept Allen's testimony that he was unable to open the door when he first tried to leave the trailer because the defendant was on the other side holding the door shut. Allen heard either the defendant or Newberry say, "Well, you know, what are we going to do?" After Allen escaped the trailer and was at his Jeep, Newberry came up to him with a gun and stated, "Let's go back inside and talk about what we're going to do." When Allen refused, Newberry shot him.

The defendant emphasizes that he was not near the Jeep when Newberry shot Allen; rather, he was staggering around outside. The defendant also relies on Allen's testimony that he never saw or heard the defendant do anything to prompt or encourage Newberry to shoot him. This evidence may have persuaded the jury that the defendant was not criminally responsible for the attempted second degree murder of Allen, but it does not undermine the legal sufficiency of the proof that the defendant facilitated the attempted second degree murder that occurred. The offense of facilitation of a felony dispenses with the requirement that the defendant act with the intent "to promote or assist the commission of the offense, or to benefit in the proceeds or results." Tenn. Code Ann. §§ 39-11-402(2), 39-11-403 (1997). Facilitation also differs from criminal responsibility in that it only requires the person to knowingly furnish "substantial assistance" whereas criminal responsibility of the "aiders and abettors" variety requires that the person "solicits, directs, aids, or attempts to aid." *Id.* We agree with the state that the jury could reasonably conclude that the defendant provided substantial assistance in the attempted murder of Allen by trying to keep Allen and Wade from escaping.

We conclude that the evidence is sufficient to support the defendant's conviction for facilitation of attempted second degree murder.

## II. Erroneous Admission of Photographs

Next, the defendant insists that the trial court committed reversible error in the admission of several color photographs of the deceased taken at the crime scene and in the admission of a photograph of the defendant when he was arrested, in which the defendant is dressed only in his undershorts and is grinning at the camera. Specifically, the defendant complains that the photographs of the deceased did not "add to" Dr. Toolsie's testimony about the cause and manner of death. The defendant further objects that the photograph of "an intoxicated man briefly smiling" had no probative value, but even if it did, the state made highly inflammatory and prejudicial use of the photograph to persuade the jury that the defendant was a "cold-blooded" murderer.

In determining whether photographs should be admitted, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used. *See Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973). Photographs must be relevant to prove some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the defendant. *Banks*, 564 S.W.2d at 951; *see* Tenn. R. Evid. 403 (relevant evidence may be admitted if its probative value is not "substantially outweighed by the danger of unfair prejudice"). On appeal, the trial court's decision to admit a photographic exhibit is reviewable for abuse of discretion. *Banks*, 564 S.W.2d at 949.

The crime scene photographs are of the deceased's body. Some of the photographs show the deceased positioned in his bed as he was found following the shooting. Other photographs were taken after medical personnel on the scene had moved and checked the body. The victim's lower torso is clothed, and only one of the photographs shows the fatal head wound. The blood loss occasioned by the shooting was not extreme. The trial court was sensitive to the shock value of the crime scene photographs; indeed, the trial court ordered the state to crop off part of one of the photographs because an earlier photograph adequately depicted the entry wound.

In our view, the trial court did not abuse its discretion with respect to these photographs. They were relevant for the jury to understand the cause of death and because the defendant was insisting that the gun had accidently discharged as the victim was reaching up to examine it. *See State v. James Wesley Osborne*, No. E1999-01071-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Knoxville, June 14, 2001) (defendant argued death of victim was accident; medical examiner properly used photographs to show defendant must have slashed victim's neck from behind). Admissibility of these photographs, furthermore, was not contingent upon a demonstration of relevance independent of and in addition to the testimony of the medical examiner. The defendant directs our attention to and quotes extensively from *State v. Collins*, 986 S.W.2d 13 (Tenn. Crim. App. 1998). That decision does not change our opinion, nor is it inconsistent with our ruling in this

case. The challenged photographs in *Collins* were of a newborn baby taken during an autopsy. Autopsy photographs traditionally have been more closely scrutinized for their unduly prejudicial potential. *See State v. Price*, 46 S.W.3d 785, 815 (Tenn. Crim. App. 2000) (autopsy photographs should be particularly scrutinized). The photographs in this case were taken at the crime scene before an autopsy was performed.

In our view, the photograph of the defendant grinning at the camera also was properly admitted. Here, the defendant's grievance is a straightforward Evidence Rule 403 objection that the photograph was highly inflammatory and unduly prejudicial. *See* Tenn. R. Evid. 403. The state successfully, and we believe fairly, exploited this picture "worth a thousand words." The defendant maintained that the shooting was an accident. The expression on the defendant's face shown in the picture seems inappropriate for someone who had, only hours earlier, accidently shot and killed his friend. Additionally, we believe that the defense adroitly blunted the sting of the photograph by characterizing it as a "picture of a drunk in his underwear."

Having carefully reviewed these photographic exhibits, we find no abuse of discretion in their admission and consideration by the jury.

### III. Expert Testimony

In his next issue, the defendant complains that the expert testimony of the medical examiner, Dr. Toolsie, should have been stricken or disallowed. Dr. Toolsie, according to the defendant, was wrongly advised about the source of the blood on the wall above the headboard of Hite's bed. Dr. Toolsie was led to believe that the blood was "spatter" or "splatter" from the gunshot wound to Hite's face, when, actually, Mark Allen was the person who left the blood smear when he braced himself with his bloody hand on the wall above Hite's headboard reaching for the telephone. The defendant argues that he is entitled to a new trial because Dr. Toolsie relied upon the "misrepresentation" about the blood on the wall to attack the defendant's position that the gun accidentally discharged as he was handing it to Hite and to support the state's theory that Hite was asleep in bed when he was shot by the defendant.

The only authority that the defendant cites in support of his argument is Tennessee Evidence Rule 703, which addresses the bases of opinion testimony by experts. Generally speaking, questions about the admissibility, qualifications, relevancy, and competency of expert testimony are entrusted to the sound discretion of the trial court. The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused. *See State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). As we shall explain, we decline to disturb the trial court's exercise of discretion in this case.

Dr. Toolsie was the second witness who testified for the state. At the conclusion of his testimony, the defendant moved to strike his testimony, but the stated reasons were lack of qualifications and improper testimony on the ultimate jury issue. The trial court exercised sound

discretion and denied the motion.  The trial court did comment that the defense could argue those reasons to the jury.

Later, when Mark Allen identified various blood smears he made throughout the trailer, including the one on the wall above Hite's bed, the defendant did not voice a new objection to Dr. Toolsie's testimony based on the earlier misrepresentation about the source of the blood on the wall.  The defendant also did not seek to recall Dr. Toolsie to capitalize on the mistake and discredit his earlier opinions.  The strategy that the defense pursued was to argue to the jury in closing that Dr. Toolsie's testimony was incredible, as evidenced, in part, by the erroneous identification of the source of the blood on the wall.  It is well settled that a defendant is not entitled to relief where he failed to take action in the trial court to prevent or alleviate the harmful effects of an "alleged" error.  *See* Tenn. R. App. P. 36(a) (nothing in rule requires "relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

We decline to hold that the trial court abused its discretion in this case in admitting Dr. Toolsie's testimony.

### IV.  Prosecutorial Misconduct

The defendant complains that prosecutorial misconduct tainted the jury's verdict in this case, thereby requiring a new trial.  This complaint appears, in one form or another, in three of the defendant's issues on appeal.

In reviewing allegations of prosecutorial misconduct, this court looks to see "whether such conduct could have affected the verdict to the prejudice of the defendant."  *State v. Smith*, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990).  That analysis involves consideration of five factors:  (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the trial court and the prosecution; (3) the intent of the prosecutor in making an improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.  *State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984); *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).  Whether the trial court erred in allowing the complained-of conduct is reviewed for abuse of discretion.  *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1972).

*A.*

The defendant first raises the specter that prosecutorial misconduct permeated and poisoned the trial.  He cites to one instance, outside the presence of the jury, when the trial court admonished prosecution counsel about "emotional eruptions."

From our review of the record, we are not convinced that prosecution counsel's demeanor and emotional eruptions had such a deleterious effect on the jury's verdict as to require

-12-

a reversal. This case was hard fought and well tried by seasoned attorneys who provided zealous representation. We believe that the jury in this instance effectively sorted the polemics from the proof as evidenced, in part, by the jury's rejection of the state's theory of first degree murder and attempted first degree murder.

*B.*

The defendant also claims that on three occasions prosecution counsel misstated the evidence. We are unable to assess one of the defendant's complaints that prosecution counsel incorrectly stated what the evidence would show during opening statements. The record before us does not contain a transcript of opening statements. The appellant is responsible for preparing a transcript containing an accurate and complete account of what transpired with respect to those issues that form the basis of his appeal. Tenn. R. App. P. 24(b). Failure to do so preempts consideration of the issue.

Another claim of misstating evidence concerns the state cross-examining the defendant about who was driving when he and Newberry left the trailer. The testimony up until that time had been that the defendant was the driver. The following exchange occurred:

> Q. You want this jury to believe you were knee-walking drunk and you were worried about him getting picked up or driving without a license?
>
> A. No, I mean I just – my car, I always drive my car.
>
> Q. Well, I think one – and I may be wrong about this – but I think one or more of the occurrence witnesses said that when you all left that place, that trailer that night, John Newberry was driving. Is that true?
>
> A. That is not true.
>
> Q. Well, I guess they didn't get, I guess –

At that point, the defense interposed an objection that the state had misquoted the evidence. Following a brief bench conference, the trial court instructed the jury not to consider the questions or comments of counsel as evidence and to disregard any misstatements of counsel.

It is unprofessional conduct for a prosecuting attorney intentionally to misstate the evidence or mislead the jury as to the inferences it may draw. *See State v. Philpott*, 882 S.W.2d 394, 408 (Tenn. Crim. App. 1994). It is as much the state's obligation to avoid improper methods calculated to produce a wrongful conviction as it is to use every legitimate tactic to produce a just one. *See Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935).

From our review, we do not consider the prosecuting attorney's question to the defendant to amount to prosecutorial misconduct. In the midst of trial, counsel for the parties are not expected to have 100 percent accurate recall of the testimony that has been presented. A trial

-13-

has many features that partake of free-form composition rather than a scripted production, and we are unwilling to brand every unintended misstep as prosecutorial misconduct. Even if, however, the question in this case could be classified as prosecutorial misconduct, we are certain that it did not affect the verdict to the defendant's detriment. In the context of the case, the identity of the driver was not particularly significant. The evidence established that the defendant was intoxicated. The defendant was not confused or misled by the question; he quickly responded that Newberry was not the driver. The trial court, moreover, cautioned the jury that counsel's comments were not evidence.

Prosecution counsel's comments during closing argument are not so easily dismissed. These closing argument comments related back to the defendant's testimony at trial. To impeach the defendant's testimony that he and Newberry went to the trailer to sell the gun in order to buy marijuana, the state, on cross-examination, introduced a police photograph of the defendant's bedroom showing money found on the floor on Newberry's side of the bed. The defendant examined the photograph and told prosecution counsel that the money belonged to Newberry to which prosecution counsel then followed up, "And I count at least $42.00 in that picture; two 20's, a one, and then there's another one on this bed." The defendant disagreed and told prosecution counsel, "I see one 20 and one." Defense counsel requested a bench conference and objected to the state's misstatement about the amount of money.

During the bench conference, the state argued that it was up to the jury to determine the amount of money. The defendant countered that the jury should not have to guess, and the trial court agreed. The trial court ordered the state to look for a police report or a property receipt that would answer the question. The state at first claimed that the receipt had been lost, and the defendant's cross-examination resumed. Later, an evidence receipt was located and provided to the trial court, but it generically described the property as "wallet and contents." During further argument outside the presence of the jury, a different photograph of the money, taken at a closer range, was examined, and the state then conceded to the trial court and the defense that from that photograph, "[I]t appears that [the defendant is] right; there's only one bill, so I guess [the jury is] going to get mad at me because I was wrong and he can tell [the jury] all about it."

The state's concession was short lived. During final closing argument, the state appealed to the jury as follows:

> This was some frolic, right of passage we're supposed to just excuse? Hey, man, he's just a kid growing up? Give him a break? We needed a licensed driver to go buy some pot? The $20.00 defense? I made reference to $40.00. Oh, remember that? He made a big deal out of that. Went over to buy pot? Well, let's just say he had $20.00. Let's take the, let's take just the testimony on that issue of the defendant that Mr. Fisher wants you to believe. He says a quarter bag you get from 40 to $50.00. Okay. I thought there was $40.00 in that picture, and if I'm wrong, there was only $20.00

At that point, the defendant interposed an objection. The trial court, however, only directed the state to rephrase its argument, which it did as "let's assume it's only $20.00."

    The wide latitude afforded to the parties in their closing arguments, *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994), carries with it the commensurate responsibility to deliver arguments that are temperate, based upon the evidence introduced at trial, relevant to the issues, and not otherwise improper under the facts or law. *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). In our view, the state failed to fulfill that responsibility. The defense called the state's hand, so to speak, when prosecution counsel framed his cross-examination question in an attempt to transform his own opinion, "I count at least $42.00 in that picture," into evidence. The state was unable to provide any documentation to substantiate the "opinion," and examination of a different photograph showed the state's error. Even so, the state continued to promote for the jury a "who are you going to believe" credibility contest. Moreover, the state waited until its final closing arguments to interject the money. At that point, the proof was closed. The state undoubtedly was aware that the defense could not successfully lobby to reopen the proof to clear up any ambiguity. Likewise, the defendant had no opportunity for additional argument to the jury.

    Although we agree with the defendant that misconduct occurred, it does not affirmatively appear to have prejudicially affected the verdict. The defendant steadfastly maintained that the purpose in going to the trailer was to sell the gun to purchase marijuana. That claim, if not effectively rebutted, was seriously undermined by proof that Newberry had enough money with him to purchase a quantity of marijuana sufficient for their personal use. Consequently, whether Newberry had $20 or $40 was fairly inconsequential in terms of ferreting out the actual motive in going to the trailer. Here, the state's misconduct is insufficient to require a new trial.

*C.*

    We have reviewed two other complaints that on one occasion an inadmissible and prejudicial opinion of Barry Wade that "I guess he was going to shoot me and Mark" was elicited by the state and that on another occasion at the end of a trial day the jury was permitted to pass around a crime scene photograph of Hite in his bed. Although included in the prosecutorial misconduct section of the defendant's brief, these issues are couched in terms of error committed by the trial court. We can find no basis to assign error to the jury's inspection of an admissible crime scene photograph. While primacy and recentness are important considerations in terms of trial strategy and advocacy, they are not, by themselves, grounds for reversible error. In addition, the state raises a valid point that inasmuch as the photograph shows the blood above the headboard of the bed, falsely believed to be "spatter" from the victim, it aided the defendant by serving to remind the jury of Dr. Toolsie's erroneous opinion. As for Barry Wade's belief that the defendant was going to shoot him and Mark Allen, that testimony, even if objectionable, had only a negligible impact in this case. The jury surely was not surprised that, under the circumstances, Wade thought he was going to be shot, and the jury, on its own, reasonably could have arrived at that opinion based on the defendant's actions. We reject these claims of trial error. Accordingly, we also reject any claim that this properly admitted evidence forms the basis for a finding of prosecutorial misconduct.

The defendant presses as a separate claim of prosecutorial misconduct that the state improperly elicited testimony about his post-arrest silence. During cross-examination of the defendant, the state twice inquired whether he told anyone at the trailer that the shooting of Hite was an accident. The defendant responded both times that he did not know and that he could not say either way. The state also asked the defendant if he made any phone calls for help or to report the shooting as an accident when he drove back to his residence. The defendant said that he did not. The state then followed up with the question, "Well, surely, now that you're in custody and somebody thinks you did something bad, you told them [law enforcement officers] it was an accident; you came forth with what happened, didn't you?" The defendant answered, "No, sir, I did not," at which point defense counsel objected and requested a bench conference. At the bench conference, the defense moved for a mistrial because the state had treaded upon the defendant's right to remain silent. The trial court denied the motion and overruled the objection.

Before completing the defendant's cross-examination, the state pressed forward a final time.

> Q. When was the first time and who did you first tell that the killing of Michael Hite was as a result of an accidental shooting?
>
> A. The first person that I spoke to about any of this was my lawyer.
>
> Q. So Mr. Fisher was the first person that you told anything about an accidental shooting?
>
> A. Yes, sir.
>
> Q. And when was that, approximately, after your arrest?
>
> A. I believe I got to see Mr. Fisher the next day.

The defense requested another bench conference and renewed the request for a mistrial. The trial court again denied the request but did advise the state not to further pursue the matter. No curative instruction was given to the jury.

Our analysis of this issue begins with the decision in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240 (1976). The defendant in that case testified at his trial on charges of selling marijuana, and for the first time, he claimed that he had been framed. To impeach the testimony, the state inquired why the defendant had not told this story immediately after his arrest. *Id.* at 612-

13, 96 S. Ct. at 2242. The defendant complained on appeal that cross-examination about his post-arrest silence was improper. The Supreme Court ruled that "the use for impeachment purposes of [defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id*. at 619, 96 S. Ct. at 2245.

Cases subsequent to *Doyle* have crystalized that the due process, fundamental unfairness concerns stem from the implicit assurances of the *Miranda* warnings. Thus, in *Jenkins v. Anderson*, 447 U.S. 231, 100 S. Ct. 2124 (1980), the Supreme Court held that due process was not violated by the impeachment use of pre-arrest, pre-*Miranda* warnings silence.[2] Two years later, in *Fletcher v. Weir*, 455 U.S. 603, 102 S. Ct. 1309 (1982), the Supreme Court then held that impeachment use of post-arrest, pre-*Miranda* warnings silence does not violate due process. *Doyle*, the *Weir* court explained, involved silence that the government had actually induced through *Miranda* warnings, and the *Weir* court noted that *Doyle* did not extend to the situation in which a defendant had not yet received *Miranda* warnings. *See id*., 455 U.S. at 605-06, 102 S. Ct. at 1311.

In the instant case, the record does not indicate that the defendant received any *Miranda* warnings during the period he remained silent immediately after his arrest. Pursuant to *Weir*, therefore, the state's cross-examination about the defendant's post-arrest silence was permissible under the federal constitution.

*Weir*, however, is not entirely dispositive of the issue. The concluding portion of the opinion in *Weir* cautions that although due process is not violated, "[a] State is entitled, in such situation, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony." *Weir*, 455 U.S. at 607, 102 S. Ct. at 1312. In other words, *Weir* did not restrict the states from affording, on state law principles, more protection to a defendant's post-arrest silence that precedes *Miranda* warnings.

The decision in *Braden v. State*, 534 S.W.2d 657 (Tenn. 1976), is frequently cited and quoted for the proposition that the prosecution should neither comment on a defendant's post-arrest silence nor use it to impeach a defendant's testimony during trial. Also frequently quoted is the passage in *Braden* that notwithstanding the general proposition, a defendant should not be allowed to use post-arrest silence to protect the defendant from the effect of patently inconsistent testimony at trial. According to the *Braden* court, "[E]vidence of *pretrial* silence of the defendant must be admitted with caution and then only where such silence is patently inconsistent with defendant's testimony." *Id*., 534 S.W.2d at 660 (emphasis added).

---

[2] Pursuant to *Jenkins v. Anderson*, no due process violation occurred when the state questioned the defendant about his pre-arrest silence. It was entirely proper for the state to elicit that the defendant had not told anyone at the trailer that Hite's shooting was an accident and that he had not phoned for help or reported an accidental shooting upon returning to his residence.

*Braden* was decided by our supreme court in March of 1976, before the United States Supreme Court released its opinion in *Doyle v. Ohio* in June of 1976. *Doyle* recognizes a strict due process prohibition to use for impeachment purposes of a defendant's post-arrest silence after receiving *Miranda* warnings. Accordingly, *Braden*'s qualified use of a defendant's silence when it is patently inconsistent with his or her testimony at trial does not survive *Doyle.*

However, as we previously noted, *Doyle* applies to impeachment use of post-arrest, post-*Miranda* warnings silence as contrasted with impeachment use of post-arrest, pre-*Miranda* warnings silence, the latter of which does not run afoul of constitutional due process per the *Weir* decision. Consequently, we are of the opinion that *Braden*'s "patently inconsistent" qualification is still viable in the factual context presented in *Weir*. The result is that Tennessee restricts impeachment use of a defendant's post-arrest silence that precedes *Miranda* warnings to those situations wherein it is patently or blatantly inconsistent with trial testimony.

The state maintains in this case that the defendant's trial testimony was patently inconsistent with his silence upon arrest; therefore, his silence is fair impeachment. The state, however, fails to identify what part of the defendant's trial testimony creates the patent inconsistency. Instead, the state generically insists that any "reasonable" person after being arrested would have made some statement that the killing was an accident, if in fact it was an accident. Of course, this one-size-fits-all argument applies with equal force to the arrested person who fails to profess, for example, self-defense, alibi, duress, entrapment, or necessity. We do not believe that a "patent inconsistency" is as expansive or as general as the state implies.

Our review of the defendant's testimony at trial reveals that his memory of the events was sketchy and incomplete. In addition, by all accounts the defendant was more than mildly intoxicated. The defendant's explanation of the shooting was that he remembered having the gun, and as he was handing it to Hite, he recalled a loud noise and a flash as it discharged. The defendant acknowledged that after he sobered up, he realized that he should never have been drinking and carrying a gun. One of the detectives who assisted with the defendant's arrest told the jury that when he entered the bedroom his first reaction was that the defendant was dead because the defendant was motionless with his head resting on a pillow and a blank stare on his face.

The defendant's testimony at trial, in our estimation, is not patently inconsistent with failing to assert, when arrested, that the shooting was accidental. His silence *on this topic*, when arrested, is ambiguous. Detective Schultz testified at trial that after the defendant was pulled from his bed, he "awoke and became verbally abusive." Thereafter, the defendant continued to be verbally abusive, cursing and using foul language whenever an officer walked past him. The defendant's actions and utterances arguably were alcohol induced; his failure to claim that the shooting was accidental, under these circumstances, is simply not blatantly inconsistent with his later testimony given when he was not under the influence of an intoxicant. It was error, in our opinion, to allow the state to use the defendant's post-arrest, pre-*Miranda* warnings silence to impeach him.

-18-

As for eliciting from the defendant that he first related the accidental nature of the shooting to his attorney the day following his arrest, the state treaded into constitutionally forbidden impeachment territory, in our opinion. Through its questions, the state wanted the jury to infer the defendant's guilt because he failed to tell the police his exculpatory story following arrest and, instead, waited until the next day to inform his attorney. Post trial, the defendant testified that the police attempted to question him after he was transported to the police station, but he elected not to speak and asked for an attorney. The state's impeachment was a thinly disguised effort to capitalize on the defendant's silence at the time of arrest and after receiving *Miranda* warnings.

The next question thus becomes whether these errors were harmless. Regarding the defendant's post-arrest, pre-*Miranda* warnings silence, in our estimation, it does not affirmatively appear that this error affected the result of defendant's trial. *See* Tenn. R. Crim. P. 52(a). Regarding the defendant's post-arrest, post-*Miranda* warnings silence, we conclude that the due process violation was harmless beyond a reasonable doubt. Our conclusion is grounded in the particular facts of this case.

The defendant's *pre-arrest* silence and failure to notify law enforcement about the accidental shooting *were* relevant and admissible in this case. The efficacy of that evidence was not overshadowed by the erroneous admission of the defendant's later silence when arrested but before receiving *Miranda* warnings or, for that matter, his silence after receiving *Miranda* warnings.

Furthermore, the defense theory that the Hite shooting was accidental was not impeached solely by the defendant's later silence. The defendant's explanation at trial of how the gun accidently discharged was nebulous. The physical evidence about the location of the entry wound and the bullet's trajectory contradicted the defendant's testimony that Hite was propped up on his side and reaching for the gun when it discharged. Moreover, the attempt by the defendant and his wife to downplay the defendant's belligerent behavior earlier that evening and to shrug off his previously expressed suspicions about his wife's fidelity quite effectively impeached the defendant's credibility.

Finally, we note that the state did not capitalize on the defendant's post-arrest silence during closing arguments. The state did reinforce for the jury that the defendant's appearance, as captured in the photograph taken shortly after arrest, was inconsistent with a person who just hours earlier had accidently shot Mr. Hite, but the defendant's verbal silence was not mentioned.

Under these circumstances we can confidently conclude that not only did the state's improper questioning not affect the result of defendant's trial, but it also was harmless beyond a reasonable doubt.

*E.*

The last complaint that the defendant raises in connection with prosecutorial misconduct is that in closing arguments, the state improperly invoked a "crime in the streets" appeal

to the jury. The state counters that the defendant reads too much into the closing arguments and that the state did not argue for general deterrence.

The final portion of the state's rebuttal closing argument included the following comments: "It doesn't just happen everywhere else; it happens here. It happened here. The buck stops here. The cycle of violence that has been demonstrated to you must be addressed for the sake of this community with a verdict of guilty, and I ask you to so find."

Argument, it has been held, may not encourage a jury to consider general deterrence. *State v. Henley*, 774 S.W.2d 908, 913 (Tenn. 1989); *State v. Irick*, 762 S.W.2d 121, 131 (Tenn. 1988). This prohibition includes a "crime in the streets" argument, whereby the jury is told that its verdict makes a statement or that its verdict demonstrates that a community will not tolerate criminal behavior. *Henley*, 774 S.W.2d at 913. Deterrence is completely irrelevant to the question of guilt or innocence and therefore outside the scope of the jury's consideration. *Id.* In *Henley*, the state "adjured the jury to let the county and the State, know that all elderly people had a right to live in peace and quiet." 774 S.W.2d at 913. The court was satisfied that the prosecutor's comments did not affect the jury's decision.

We have canvassed other case law in this area. *See State v. Michael Wayne Downs,* No. 88-275-III, slip op. at 7 (Tenn. Crim. App., Nashville, Nov. 7, 1989), *aff'd on other grounds sub nom. State v. Bryant*, 805 S.W.2d 762 (Tenn. 1991) (state improperly argued in connection with an illegal narcotics prosecution, " The judge will instruct you that he will assess the punishment, which you assess the profit motive. [Sic]  I beg you to take it away. Take it away, and *send a message across Maury County that you Nashville drug dealers* and you Maury County drug dealers, if you are going to do the crime, you're going to pay for it, dearly") (emphasis in original); *State v. Tony Willis*, No. 3 (Tenn. Crim. App., Jackson, Jan. 21, 1987) (state improperly, yet harmlessly, remarked in closing argument that "victims had rights and that the jury should send a message back to Fort Pillow State Prison"); *State v. William Charles Jones*, No. 01C01-9512-CC-00402, slip op. at 6 (Tenn. Crim. App., Nashville, June 30, 1997) (cumulative effect of a host of inflammatory arguments, which included asking the jury to send a message by its verdict, appealing to racial considerations, referring repeatedly to "gangs" and "gang violence," and incorrectly stating the law concerning reasonable doubt, resulted in reversible error). In this case, we do not construe the state's argument as appealing to the need for general deterrence or to the need to "send a message." The statement, "It [homicide] doesn't just happen everywhere else, it happens here," simply does not implicate the concerns that the court's opinions have previously addressed. Likewise, telling the jury that the "buck stops here," means only that the jury "in this particular case" has the final word. The third statement that the "cycle of violence *that has been demonstrated to you* must be addressed for the sake of this community with a verdict of guilty" (emphasis added), was specific to the defendant's trial and what the state had proved. This argument was not a plea for general deterrence.

The state, in our opinion, did not advance a "crime in the streets argument," and the defendant's claim is, thereby, rejected.

## V. Jury Instructions

The defendant on appeal challenges the trial court's refusal to give a requested jury instruction, similar to that given in DUI prosecutions, on the legal effect of a blood alcohol of .10%. The trial court did charge the jury about voluntary intoxication and its effect on the required culpable mental state. The defendant does not assign error to the trial court's voluntary intoxication instruction. Rather the defendant maintains that the given instruction should have been supplemented with the DUI presumption charge. We disagree.

An instruction regarding the legal effect of intoxication on the ability to operate a motor vehicle is irrelevant to the issue whether the defendant possessed the required culpable mental state to find him guilty of one or more homicides. Giving a DUI presumption charge could have thoroughly muddled the jury's deliberations. The defendant asserts that there would have been no harm in allowing the charge to the jury. Nonetheless, so long as the trial court's instructions correctly stated the law and "fully and fairly" set forth the law applicable to the facts, no error resulted from the refusal to give the requested special instruction. *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987). Inasmuch as the defendant has not demonstrated that the charge actually given was deficient and that the requested charge was relevant to the homicide issues, we affirm the trial court's refusal to instruct the jury as the defendant had requested.

## VI. Sentencing

In his final issue, the defendant insists that his sentences are excessive because the trial court found and weighed inappropriate enhancing factors and disregarded pertinent mitigating factors. The defendant challenges the application of enhancement factor (2) that the defendant was a leader in the commission of an offense involving two or more criminal actors, Tenn. Code Ann. § 40-35-114(2) (Supp. 2000), and enhancement factor (4) that the victim was particularly vulnerable because of age or physical or mental disability, *id.* § 40-35-114(4) (Supp. 2000). On the mitigation side, the defendant insists (1) that he should have been given the benefit of having provided substantial assistance to law enforcement authorities, and (2) that the trial court ignored witnesses and correspondence that had been submitted. The defendant does not suggest what sentences he regards as appropriate.

### A. Standard of Review

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991); *see State v. Hooper,* 29 S.W.3d 1, 5 (Tenn. 2000). "The burden of showing that the sentence is improper is upon the appellant." *Ashby*, 823 S.W.2d at 169. In the event the record fails to demonstrate the required consideration by the trial court, review of the

-21-

sentence is purely *de novo*. *Id.* If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The mechanics of arriving at an appropriate sentence are spelled out in the Criminal Sentencing Reform Act of 1989. At the conclusion of the sentencing hearing, the trial court determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210(a), (b) (Supp. 2000); *id*. § 40-35-103(5) (1997).

## B. Arriving at the Sentence

The defendant qualified as a Range I standard offender for sentencing. His conviction for the second degree murder of Hite is classified as a Class A felony, with a sentencing range of 15 to 25 years. Tenn. Code Ann. § 39-13-210 (1997). In dealing with such a conviction, the sentencing court starts with the presumption that the defendant should receive a sentence in the midpoint of the range without any enhancement or mitigating factors. *Id*. § 40-35-210(c) (Supp. 2000). If enhancement or mitigating factors do apply, the sentencing court is directed first to "enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors." *Id*. § 40-35-210(d), (e) (Supp. 2000). A similar analysis applies to the defendant's conviction for facilitation of attempted second degree murder. That conviction is a Class C felony, with a sentencing range of three to six years. *Id*. §§ 39-12-107(a) (criminal attempt is an offense one classification lower than the most serious crime attempted), 39-11-403 (b) (facilitation of the commission of a felony is an offense of the class next below the felony facilitated) (1997). For this type of conviction, the sentencing court starts with the presumption that the defendant should receive a minimum sentence in the range without any enhancement or mitigating factors. *Id*. § 40-35-210(c) (Supp. 2000).

The sentencing court applied three enhancement factors to the second degree murder conviction. First, the "defendant was a leader in the commission of an offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(2) (Supp. 2000). Second, a "victim of the offense was particularly vulnerable because of age or physical or mental disability." *Id*. § 40-35-114(4) (Supp. 2000). Last, the "defendant possessed or employed a firearm . . . during the commission of the offense." *Id*. § 40-35-114(9) (Supp. 2000). The defendant does not challenge the application of this last enhancement factor. For facilitation of attempted second degree murder conviction, the sentencing court applied enhancement factors (2) and (9). *Id*. § 40-35-114(2), (9) (Supp. 2000). No mitigating factors were applied to either conviction. Weighing the enhancement

factors, the trial court arrived at a sentence of 25 years on the second degree murder conviction and five years for the facilitation conviction. The sentences were ordered to run concurrently.

The defendant objects to the finding that he was a leader in the commission of the offenses. His arguments, however, are retreads of the defense theory at trial, namely that there was no conspiracy or plan between Newberry and himself to conduct a "shooting spree." The sentencing court pointed to the proof that the defendant and Newberry drove together to the trailer, that they brought a gun with them, that the defendant used the gun to shoot Hite, and that Newberry next used the gun to shoot Allen. Enhancement factor (2) can apply even if the defendant is not the sole leader, but rather "a" leader. *See State v. Hicks*, 868 S.W.2d 729 (Tenn. Crim. App. 1993). That being said, we believe that enhancement factor (2) was properly applied only to the second degree murder conviction. The state concedes on appeal that this factor does not apply to the defendant's facilitation conviction. We agree. Moreover, we are somewhat at a loss to envision a situation wherein a defendant, although facilitating the offense but lacking the intent to promote, assist, or benefit from the offense, would be considered "a" leader in the offense.

The defendant further objects that Hite was not a particularly vulnerable victim. The trial court applied this enhancement factor for two reasons. First, if Hite was asleep when he was shot, he was particularly vulnerable. Second, even if he was awake, Hite had retreated from the world to his private bedroom where he could expect to be left alone.

A victim is particularly vulnerable if, due to physical or mental limitations, she or he is incapable of resisting, summoning help, or testifying against the perpetrator. *See State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993). Moreover, a victim's physical or mental limitation may be temporary or self-induced. *See State v. Nicholas Williams*, No. M1999-00780-CCA-R3-CD, slip op. at 12 (Tenn. Crim. App., Nashville, July 3, 2001). Whether a victim's limitations render him or her particularly vulnerable is a factual issue to be determined on a case-by-case basis. *See State v. Gray*, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997).

Enhancement factor (4) has been applied in the context of a sleeping victim. *State v. Nicholas Williams*, slip op. at 12 (the sleeping, intoxicated minor victims were particularly vulnerable to the defendant's attack, thus justifying application of enhancement factor (4)); *State v. Clayton Eugene Turner, II*, No. 03C01-9805-CR-00176, slip op. at 33-34 (Tenn. Crim. App., Knoxville, Oct. 6, 1999) (sleeping ten-year-old was particularly vulnerable to appellant's assault; record justifies application of enhancement factor (4)), *perm. app. denied*, (Tenn. 2000); *State v. Tony Wayne Snyder*, No. 03C01-9403-CR-00101, slip op. at 17 (Tenn. Crim. App., Knoxville, Nov. 21, 1995) (sleeping seven-year-old was particularly vulnerable to the offense of arson), *perm. app. denied* (Tenn. 1996). We see no reason why, as in this case, a sleeping adult could not be regarded as particularly vulnerable to being shot.[3]

---

[3] We need not pass on the sentencing court's finding that the victim was particularly vulnerable because he had retreated to the sanctity of his bedroom. There well could be situations in which the victim's physical limitations derive

(continued...)

In our opinion and pursuant to *de novo* review of the record, the trial court correctly considered and applied enhancement factor (4).

As for mitigating factors, the defendant laments the sentencing court's refusal to consider mitigation factor (10) that the defendant assisted the authorities in locating or recovering any property or person involved in the crime. *See* Tenn. Code Ann. § 40-35-113(10) (1997). Because the defendant did not help locate or recover the murder weapon until he had secured legal representation, he concludes that the sentencing court penalized him for exercising his constitutional right to counsel.

Mitigating factor (10) provides, "The defendant assisted the authorities in locating or recovering any property or person involved in the crime." Tenn. Code Ann. § 40-35-113(10) (1997). This language does not restrict consideration to defendants who render assistance prior to securing legal representation or before proceeding to trial. It is sufficient if the assistance is provided sometime prior to sentencing. *Cf.*, *State v. Lord*, 894 S.W.2d 312, 318 (Tenn. Crim. App. 1994) (factor (10) "is broad enough to apply not only to locating any fellow perpetrators and instruments of crime, but to locating victims and property that are the objects of criminal conduct, as well"). Sentencing courts, however, are not locked into assigning any particular weight to this mitigating factor. Assistance can be evaluated by taking into account factors such as (1) the nature and extent of the defendant's assistance; (2) the significance and usefulness of the defendant's assistance; (3) the truthfulness, completeness, and reliability of the assistance; (4) any risk of injury to the defendant or retaliation directed to the defendant's family resulting from the assistance provided; and (5) the timeliness of the assistance provided. *See, e.g., State v. Jon Robert Goodale*, No. M2000-02140-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App. Nashville, Sept. 14, 2001) (from beginning of defendant's involvement with police, he lied and mislead authorities as well as the victim's family); *State v. Damien Jackson*, No. M2000-00763-CCA-R3-CD, slip op. at 12 (Tenn. Crim. App., Nashville, Jul. 18, 2001) (only reason defendant told police where guns were was to keep his mother out of trouble); *State v. Ricky A. Burks*, No. M2000-00345-CCA-R3-CD, slip op. at 30 (Tenn. Crim. App., Nashville, May 25, 2001) (defendant called 911 three times to mislead the police and came to police station to outsmart the police) (collecting and citing cases involving mitigating factor (10)).

In this case, the sentencing court should have considered the assistance that the defendant provided. Even so, in our opinion, mitigating factor (10) should be afforded slight weight and does not justify a modification of the defendant's sentences. The defendant's attempt to lead law enforcement to the location of the discarded murder weapon was unsuccessful and resulted only in the recovery of a bag that might have been a magazine pouch. The defendant's assistance was not particularly useful or substantial.

---

[3](...continued)
from physical "location" instead of "body impairment." For instance, a victim who is confined to a jail cell would be particularly vulnerable to a shooting attack by someone outside the cell door because no avenue of escape from the cell exists.

-24-

Because we conclude that mitigating factor (10) applies in this case, it is unnecessary to tackle the defendant's assertion that he was punished at sentencing for the exercise of his constitutional rights. The defendant does not couch his comments in terms that squarely raise a constitutional violation or deprivation. *See State v. National Optical Stores Co.*, 189 Tenn. 433, 225 S.W.2d 263 (1949) (court will not pass on constitutionality of statute or any part unless absolutely necessary for determination of case and present rights of the parties). At any rate, we perceive an important distinction between constitutionally protected conduct that is used to "enhance" a sentence and the failure to reward a defendant with mitigating credit at sentencing for such conduct.

The defendant's final sentencing complaint is that the trial court failed to give any sentencing consideration to numerous letters and a petition offered on the defendant's behalf. We note that numerous letters composed by friends and family of both the defendant and of the deceased, Michael Hite, were addressed and submitted to the presentence investigator, along with a petition signed by individuals supporting a minimum sentence for the defendant. The presentence investigator, in turn, filed the petition and letters as an addendum to the original presentence report, and copies were sent to the trial court and defense and prosecution counsel.

It was the consensus of those writing letters on the defendant's behalf that he should receive a minimum sentence, while those who wrote about the loss of Michael Hite insisted that the defendant deserved the maximum penalty that the law could extract. The trial court ruled that, except for two victim impact statements submitted by Mark Allen and by Hite's mother, the letters, petitions, and articles that had been received were "inadmissible," which we interpret to mean that these materials were not considered in arriving at the sentence. To facilitate appellate review, the trial court did permit the materials to be made part of the record.

Under Tennessee law, a trial court "shall" afford the parties at a sentencing hearing the opportunity to be heard and to present evidence relevant to the particular sentencing task at hand. Tenn. Code Ann. § 40-35-209(b) (Supp. 2000) (emphasis added). The sentencing statutes and principles permit hearsay to be admitted, with two exceptions. As with other information, any hearsay must be "relevant to the sentencing of the defendant," and it should be "reliable." *Id.*; *see State v. Mounger*, 7 S.W.3d 70, 76 (Tenn. Crim. App. 1999) (parties shall be afforded opportunity to be heard and present relevant evidence at sentencing). Accordingly, the admissibility of hearsay letters written in connection with an upcoming sentencing determination will turn upon reliability and relevancy.

Before reaching the question of evidentiary admissibility, however, a sentencing court must determine if the hearsay letters are properly before it. It is inappropriate for a citizen to communicate with or write directly to a sentencing judge about a pending case. In that situation, "most judges, knowing that such letters are improper, either don't read the letters or don't consider the letters in reaching their decision." *State v. Birge*, 792 S.W.2d 723, 725 (Tenn. Crim. App. 1990); *see State v. Bud Cash*, No. 286, slip op. at 23 (Tenn. Crim. App. Knoxville, Jan. 30, 1992) ("All of the letters were sent directly to the trial judge. He correctly noted that such a procedure was improper and stated that he had not read most of the letters."). Even so, such letters should be made

part of the record of the case to provide notice to the parties and to avoid the appearance of improper influence. *Birge*, 792 S.W.2d at 725.

It appears to us that the hearsay letters and the petition in this case were not funneled straight to the sentencing court. Evidently, the materials were solicited by counsel for the parties and were addressed and submitted to the presentence investigator who then incorporated the materials into an addendum to the original presentence report. Copies of the addendum were forwarded to counsel for the parties and to the sentencing court. During the sentencing hearing, the defendant requested that the sentencing court consider the materials in the addendum, which the court declined to do. We are satisfied that the materials were properly before the sentencing court. *See State v. Bud Cash*, slip op. at 23-24 (although letters sent directly to trial judge, the defendant subsequently adopted and proffered them as an exhibit at sentencing hearing; trial court's "summary refusal" to review the letters was inappropriate).

Unlike the *Bud Cash* sentencing court that summarily refused to review character letters properly before it, the court in this case apparently perused the materials sufficiently to conclude that the defendant's supporters were advocating a minimum sentence, while Hite's friends and family were urging a maximum sentence. Unless and until public opinion polls are introduced and approved as a suitable basis for arriving at an appropriate sentence for a convicted defendant, hearsay opinions, such as expressed in this case, are irrelevant to the sentencing process and, therefore, inadmissible.

Moreover, even if there is other personal history type of information contained in the materials, the relevance of the information is not explained by the defendant. We recognize that character letters are frequently submitted for sentencing and that, generally speaking, character letters should be given due consideration. *See State v. Bud Cash*, slip op. at 23. In this particular case, however, the defendant was facing a certain incarcerative sentence for his second degree murder conviction. At sentencing, the defendant did not explain how the petition or the letters were relevant to rebut the statutory enhancement factors or to support any of the mitigating factors being offered. We are loath in these circumstances to fault the sentencing court's refusal to take these materials into account in imposing a sentence.

In summary, we conclude that enhancement factors (2), (4),and (9) are applicable to defendant's conviction for second degree murder, and the trial court's sentencing based on those factors is appropriate; the defendant's 25-year sentence on this conviction is affirmed.

## VII. Conclusion

In conclusion, the evidence at trial was legally sufficient to support the defendant's convictions for second degree murder and facilitation of attempted second degree murder, and the sentences imposed are appropriate. The jury instructions adequately explained the relevant legal principles, including voluntary intoxication and its effect on the required culpable *mens rea* for the charged and lesser-included offenses. The verdict, we conclude, was not tainted by prosecutorial

misconduct, and the jury was not improperly allowed to consider expert testimony or to view photographs of the deceased and the defendant. While the state should not have been permitted to question the defendant about his post-arrest silence, the error in this instance was harmless. The judgment of the trial court is, therefore, affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE