**STATE of Tennessee, Appellee,**

v.

**Charles Jackson LORD, Jr., Appellant.**

No. 02C01–9403–CC–00051.

Court of Criminal Appeals of Tennessee, at Jackson.

Nov. 2, 1994.

Permission to Appeal Denied by Supreme Court Feb. 6, 1995.

Mark S. McDaniel, Memphis, for appellant.

Charles W. Burson, Atty. Gen., Joel W. Perry, Asst. Atty. Gen., Nashville, Elizabeth T. Rice, Dist. Atty. Gen., Somerville, for appellee.

## OPINION

TIPTON, Judge.

The defendant, Charles Jackson Lord, Jr., was convicted upon his pleas of guilty in the

Fayette County Circuit Court of first degree murder and aggravated rape. He received sentences of life and twenty years in the custody of the Department of Correction, to be served consecutively. The defendant appeals as of right and states his grounds as follows:

1. The trial court abused its discretion by imposing a twenty (20) year consecutive sentence in count 2, aggravated rape.

2. The trial court erred in finding that no mitigating factors existed.

This case arose from the August 7, 1992, disappearance of Mrs. Martha Roberts from her home in Eads and the ultimate discovery of her remains almost thirteen months later, buried in the defendant's yard. After the disappearance, a series of telephone calls to the victim's husband and others were made by a man indicating that he was involved in the disappearance and wanted ransom. At one point, he stated that the victim had died.

Almost a year after the disappearance, the investigation focused upon the defendant, resulting from evidence that he was the caller. After assurances were given that the death penalty would not be sought, police interviews with the defendant were conducted on August 26, September 1 and September 2, 1993, each being recorded. In each interview, the defendant gave a different account of the victim's death.

In the first interview, the essence of the defendant's story was that he made a telephone call to the Roberts' home feigning interest in the purchase of some property in order to have Mr. Roberts leave the house. The defendant said that after Mr. Roberts left, he went to the house and told the victim that her husband had been in a serious accident. She left with him in his truck, ostensibly for the purpose of going to her husband. The defendant said the victim was very upset and collapsed. He said that he determined that she was not breathing and panicked. The defendant stated that he drove to the middle of a bridge and threw the victim into the river.

Generally, the defendant admitted that he had made the ruse for the purpose of obtaining money that he said he needed. He indi-

cated that it was potentially a kidnapping that he had first considered some three to four months earlier. Also, he acknowledged making some ransom calls.

The authorities conducted an extensive search of the area where the defendant said he disposed of the body, but to no avail. They sought to have the defendant take a polygraph examination regarding the location of the body and he apparently disclosed to them that the victim's body was buried on his property. Late on August 30, the body was found buried in a pit behind the defendant's compost pile in the back yard of his residence. It was removed on August 31 and an autopsy was ultimately performed.

In the defendant's second interview on September 1, he said that the victim was having marital problems and that they became romantically involved. He stated that he got her husband out of the house on the morning of August 7 in order to talk to her more about her problems. He said that he went to her house and they had sexual intercourse. He related that when he mentioned something about needing money, the victim became angry because she thought that he was showing her affection to obtain money. He said that he was not sure what happened, but that he smothered her with a pillow for a brief time.

He said he then panicked and put her in his truck with the idea of throwing the body in the river. However, fearing detection, he took her to his residence. The defendant said that he remembered that he had been "double digging" his compost pile and he placed her into the pit. He said that he dug a new pit every year. He said he put two bags of lime on the body and pushed dirt into the pit. He then shoveled sacks of concrete in. Later, he turned some earth and some leaves to cover the site. He said he made a "kidnapper type" call to Mr. Roberts.

In the third interview, the defendant stated that a lot of what he told the authorities in the previous interviews was false and that he wanted to tell the truth. He said that he was in dire financial straits and decided to kidnap the victim for ransom. Although he claimed that he did not consider the need to kill her to be a certainty, he acknowledged that he

dug the pit behind his compost pile for burial purposes.

The defendant confirmed the truth of the ruses he recounted in his first statement which led to Mr. Roberts leaving the home and the victim getting into the truck. He took her to the garage apartment at his residence. He had previously prepared strips of rags and a belt with which he bound the victim to a chair. He placed duct tape over her eyes. He made her take sleeping pills and pain pills. After the drugs took effect, the defendant removed her clothes and placed her upon the bed, still bound. He burned her clothes after cutting off the buttons, metal snaps and other nonburnable items for separate disposal.

The defendant called Mr. Roberts in the midafternoon and demanded one hundred thousand dollars as ransom. He went back to the garage apartment and bound the victim to the chair, again. The defendant said that his wife, who was unaware of any of his activities in the apartment, told him that Mr. Roberts had called her to see if she had seen the victim. After the defendant's wife went to bed, the defendant returned to the apartment and placed the victim on the bed.

The defendant stated that the victim was still groggy. He said he began fondling her and had sexual intercourse. Afterwards, he gave her some more pills. Then he smothered her with a pillow. He said he placed her in the pit and covered her as he had previously described.

In this third interview, he acknowledged that he did not believe the victim's body would be found in as good a condition as it was. He admitted that his belief that the autopsy would uncover certain things led him to admit smothering the victim, having sex with her and her taking pills.

The state relied upon the defendant's account in the third interview at the guilty plea hearing. At the sentencing hearing, evidence was introduced showing that the defendant had obtained a series of fraudulent loans from 1985 through 1987 from the Memphis Defense Federal Credit Union, that he had embezzled over one hundred fifty thousand dollars in 1989 from the federal government while he worked at the Memphis Defense Depot and that he had misappropriated some seventy-seven thousand dollars during 1991 and 1992 from funds belonging to his church. Also, the evidence showed that the defendant gave numerous false statements during various criminal investigations.

Dr. John Hutson, a clinical psychologist, testified about his evaluation of the defendant. He concluded that the defendant showed a Cluster B Personality Disorder, exhibiting elements of anti-social, borderline narcissistic and histrionic personality styles. He stated that the defendant's various traits included a lack of concern for others, a lack of concern for community standards, being self-centered, being somewhat self-destructive, being superficial, and having a lack of empathy. Dr. Hutson said that he was astonished, though, at the defendant's admission of rape, indicating that it was not consistent with the nature of his problems. He agreed with the prosecutor's assessment of the defendant being "a liar, a cheat, and a killer." Also, Dr. Hutson believed that the defendant's mental condition impaired his judgment, "but not significantly so."

The trial court began its sentencing determination with a lament for the judicial system's inability to be society's means to requite all tragedies its citizens cause. It commented strongly upon the defendant's history of lies and noted the singular thread of the defendant's self-serving interest in all that had occurred. In fact, it stated that it did not believe ninety percent of the statements given by the defendant and added, at one point, that it did not believe the rape incident, and if it happened, it was not under the circumstances described by the defendant.

The trial court imposed a mid-Range I sentence of twenty years for the aggravated rape, a Class A felony. It enhanced the sentence above the presumptive minimum because it found that the defendant had a previous history of criminal behavior and that he willfully inflicted death upon the victim resulting from the rape. See T.C.A. § 40–35–114(1) and (12). It ordered the sentence for the aggravated rape to be served consecutively to the life sentence because it determined the defendant to be a dangerous

offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. *See* T.C.A. § 40–35–115(b)(4).

■ The defendant styles his first issue in terms of the trial court abusing its discretion in requiring the aggravated rape sentence to be served consecutively. However, his argument does not contend that the record does not support the conclusion that he is a dangerous offender. Instead, the defendant argues that there is no factual basis in the record for the aggravated rape guilty plea because the only evidence of rape was his admission that it occurred, but that the trial court found his statements to have no credibility. He asserts that the record is such that his aggravated rape conviction should be dismissed or that his sentences should run concurrently.

The defendant seeks support from *State v. Mackey*, 553 S.W.2d 337, 341 (Tenn.1977), in which our supreme court provided the procedures for the trial court to follow on the record in accepting a guilty plea, including the need to determine that a factual basis for the plea exists. These procedures were essentially taken from Rule 11, Fed.R.Crim.P., and, later, essentially included in Rule 11, Tenn.R.Crim.P. We believe that the defendant misapprehends the purpose of the factual basis requirement, the state of the record in his case, and the available remedy even if this procedural requirement had been ignored.

■ First, we note that "[a] plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." *Blankenship v. State*, 858 S.W.2d 897, 903 (Tenn. 1993) (quoting from *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969)). Thus, it is the guilty plea, itself, that provides the basis for the conviction. *See McMann v. Richardson*, 397 U.S. 759, 766, 90 S.Ct. 1441, 1446, 25 L.Ed.2d 763 (1970). Given this significant result from the entry of a guilty plea, the focus of the inquiry at a guilty plea hearing is on whether or not the plea is being voluntarily and intelligently made and the procedural requirements provided by *Mackey* and Rule 11, Tenn.R.Crim. P., insure that the record will show that such a plea occurs.

■ In this context, the requirement that the record show a factual basis for the plea primarily exists to insure that the defendant's guilty plea is made with his understanding that his admitted conduct actually constitutes the offense with which he is charged or a lesser included one. *See McCarthy v. United States*, 394 U.S. 459, 466–67, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969). In other words, the factual basis inquiry focuses upon what the defendant understands about the applicable law in relation to the facts he is admitting. Thus, upon the record showing that a guilty plea is voluntarily and understandingly being made, the guilty plea, by itself, is sufficient to support a conviction.

■ In this respect, the existence of a factual basis may be shown by numerous sources in the record, whether it be a prosecutor's statement of the evidence, live testimony or otherwise. *See Chamberlain v. State*, 815 S.W.2d 534, 540 (Tenn.Crim.App. 1990); *United States v. Goldberg*, 862 F.2d 101, 105 (6th Cir.1988); *United States v. Darling*, 766 F.2d 1095, 1100 (7th Cir.), *cert. denied*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985). In this case, the record of the guilty plea hearing reflects that the trial court called upon the state to provide the factual basis for the pleas. The state called two witnesses and submitted the autopsy report. Shelby County Sheriff's Inspector Carol Swain testified about her dealings with the defendant, his lying and his subsequent detailed admissions about kidnapping, raping and killing the victim. She recounted how he described where and how the victim was buried, including her being unclothed. She said the victim's body was found at the location and in the state of dress described by the defendant. She added that the defendant was surprised at the victim's lack of decomposition. She noted that the autopsy report's conclusion about the cause of death, asphyxia, was consistent with the

defendant's statement that he smothered the victim.

Fayette County Sheriff Bill Kelley testified about his involvement with the investigation in cooperation with Shelby County and federal authorities. He recounted the detailed statements by the defendant in the September 2nd interview, including the defendant's admission of having sex with the victim while she was under the influence of the pills he had given her. He said that a search of the defendant's house disclosed strips of sheets of a length and width matching the description of the strips the defendant claimed to have used to restrain the victim in the apartment. He noted that the defendant said that he had smothered the victim after having sex with her and that the victim's body was unclothed when it was found.

The trial court held an extensive colloquy with the defendant, a college graduate, showing that the defendant was aware of and understood the nature and elements of the charges against him, the nature of the proceedings, the rights afforded him in a criminal prosecution, the ramifications of his waiver of those rights in pleading guilty, and the consequences of his guilty pleas. The defendant expressed his desire to enter the guilty pleas and asserted that they were voluntary and uncoerced. His attorney requested that the trial court accept the pleas. The trial court then allowed the defendant, personally, to plead guilty to the charges and found him guilty of first degree murder and aggravated rape.

The presentation of the defendant's admissions and other corroborating evidence [1] was sufficient to show all of the elements needed for first degree murder and aggravated rape

so as to warrant the trial court's finding that a factual basis existed for the guilty pleas. Nothing more was required. It was only at the time of sentencing that the trial court expressed doubts about the truth of the defendant's statements, given his history of lying. However, the record also reflects that the trial court relied upon the defendant's guilty plea to aggravated rape as the truth of the matter when it imposed the twenty-year consecutive sentence and entered the judgment of conviction for that offense. Thus, given the record of a factual basis for the plea, the trial court's acceptance of the plea and the voluntary and intelligent nature of the plea, the conviction is valid.

 In any event, we note that the relief sought by the defendant would be unavailing regardless of how the trial court's actions are viewed. Even if the record showed no factual basis for the guilty plea, dismissal of the charge would not be the remedy. Rather, a remand of the case would occur to allow the defendant the opportunity to withdraw the guilty plea and plead anew or, in some circumstances, to allow the trial court to make its assessment on the record of the needed factual basis. *See United States v. Goldberg*, 862 F.2d at 106–107; *United States v. Darling*, 766 F.2d at 1100. Furthermore, the fact that the trial court expressed doubts about the truth of the defendant's statements is not an appropriate basis to justify our altering the trial court's consecutive sentencing decision. By its entering the judgment of conviction, the trial court expressed its ultimate opinion about the validity of the guilty plea. In this respect, the record supports the trial court's determination that the defendant is a dangerous of-

---

1. The defendant does not specifically contend that the rule that a person may not be convicted on the basis of a confession alone, *see Ashby v. State*, 124 Tenn. 684, 139 S.W. 872 (1911), applies in the context of guilty plea convictions which are based upon judicial admissions. Although we note that a sister state has concluded that the rule does not apply to guilty pleas, *see People v. Stice*, 160 Ill.App.3d 132, 112 Ill.Dec. 49, 52, 513 N.E.2d 463, 467 (1987), we need not worry with this issue because we view the defendant's out-of-court statements to be sufficiently corroborated by the remaining evidence which

tended to establish the trustworthiness of his admissions. Only slight evidence of the corpus delicti is necessary to corroborate a confession in order to sustain a conviction. *State v. Ervin*, 731 S.W.2d 70, 72 (Tenn.Crim.App.1986). The defendant's initial lying about the body's location, his admission of sexual intercourse after his believing that an autopsy could prove what occurred, the body being found as described by the defendant, particularly its nude condition, and the finding of strips of sheets constitute sufficient corroboration. *See, e.g., State v. Buck*, 670 S.W.2d 600, 609–610 (Tenn.1984).

fender and its imposition of consecutive sentences.

As to the length of the aggravated rape sentence, the defendant does not contest the enhancement factors imposed, but claims that the trial court erred in refusing to apply in mitigation the fact that he assisted the authorities in recovering the victim's body. He relies upon T.C.A. § 40-35-113(10) which provides mitigation for a defendant who "assisted the authorities in locating or recovering any property or person involved in the crime." The state contends that this factor does not apply to the recovery of deceased victims. However, we believe that its reach is broad enough to apply not only to locating any fellow perpetrators and instruments of crime, but to locating victims and property that are the objects of criminal conduct, as well. Assisting in the recovery of a victim of crime, as with the recovery of stolen property, should be considered in mitigation in the appropriate case.

In this case, though, the defendant's assistance in recovering the victim's body must be measured as mitigation against his obtaining the assurance he would not be exposed to the death penalty and his repeated falsehoods after he became the main suspect. Under the circumstances in this case, we do not believe that the defendant's assistance constitutes such mitigation as to warrant a reduction in the sentence imposed. The twenty-year consecutive sentence was justified.

The judgment of conviction is affirmed.

JONES and PEAY, JJ., concur.