# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 7, 2003

## STATE OF TENNESSEE v. ANTHONY CROWE

**Appeal from the Circuit Court for McNairy County**
**No. 1465A     Jon Kerry Blackwood, Judge**

_____

### No. W2003-00800-CCA-R3-CD  - Filed April 30, 2004
_____

The defendant, Anthony Crowe, appeals as of right the McNairy County Circuit Court's denial of his motion to withdraw his guilty plea to facilitation of first degree murder, for which he is serving a sentence of eighteen years in the Department of Correction. He also complains that the length of his sentence is excessive and should be modified. We conclude that the defendant has failed to establish that the trial court abused its discretion in denying the motion to withdraw the guilty plea. Additionally, we find no error in the sentence imposed by the trial court. Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JAMES CURWOOD WITT, JR., J., filed a dissenting opinion.

Pamela Dewey-Rodgers, Selmer, Tennessee (at trial); and Karen T. Fleet, Bolivar, Tennessee (at trial and on appeal), for the Appellant, Anthony Crowe.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Jerry W. Norwood, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

The facts leading to the facilitation conviction are gleaned from the transcript of the defendant's *nolo contendere* plea submission conducted on June 21, 2002. The defendant, Anthony Crowe, and the co-defendant, Tommy Poe, were originally charged in a single-count indictment with the first degree murder of Bobby Joe Smith on June 26, 2001. Through plea negotiations, the State had agreed to amend the indictment relative to Poe to charge second degree murder and to amend the indictment against the defendant to facilitation to commit first degree murder. Some members of the victim's family supported the agreement, and others opposed it. At the plea submission

hearing, the court solicited the opinions of interested family members and permitted them to offer sworn testimony, after which the court advised that it was going to accept the proposed settlement.

At the plea hearing, the State recited that its proof would show the following:

[I]f this case went to trial, among the State's proof would be that on or about June 26, 2001, that [the defendant] and Mr. Poe, along with another individual, Ruby Borden, went -- had been together that day. They all know each other[,] and they knew Bobby Joe Smith. On this particular day, Ms. Borden, they were all up at the house. So, she goes down to Mr. Smith's house. I think the proof would be that she went down there to attempt to get what I believe the testimony was weed or marijuana.

I believe the proof would be that Mr. Poe and [the defendant] stayed down at another person's house waiting for her to return. By the time she got back down there -- I think Mr. Poe was her boyfriend -- and by the time she had gotten back down there, I believe the proof would be that he had gotten kind of upset because she hadn't gotten back in a time that he thought would be appropriate.

After she had gotten back and told them she didn't bring any weed or anything, through some conversation among them and activity, the three of these people got in the car. Ms. Borden drove them back down to Mr. Smith's house, which wasn't all that far down there. When they got down there, I believe Ms. Borden's testimony would be that the three of them got out of the car, that Mr. Poe, when he got out, he had a ball bat.

They went up to the door, she knocked or summoned Mr. Smith to the door. When he opened the door, Mr. Poe hit him with this bat. I believe the proof would be that as that was happening, then Ms. Borden jumps in the car and drives off up to another neighbor's house not too far away who they all knew. I believe the proof would be that about this time, a call went in to 911 that there was a commotion going on over at Mr. Smith's house, and that call would have come from the next door neighbor who heard some racket and stuff over there.

As a result of that telephone call, the police went pretty quickly out to Mr. Smith's house, and this is around midnight. When the police had gotten out there -- there was different ones went different places -- when they got out there, they found Mr. Smith lying in the floor there just right inside the door, bruised and battered, and his throat had been cut severely and there was blood all over the floor there.

At some point, I think the neighbor or someone had saw that vehicle leave there, and they recognized that vehicle as being one that Ms. Borden and Mr. Poe rode in. So, as a result of that information, the police were actually looking for Mr. Poe and [the defendant], and I think they was having some conversation on the radio,

which happened to be picked up on a scanner. The proof would also be that before the police had gotten there, that [the defendant] and Mr. Poe had come up from out of the woods up there at the house where Ms. Borden was, and by that time the lady that lived there had come there.

There was a lot of screaming and crying and carrying on. There was blood all over Mr. Poe. I believe the proof would be that Mr. Poe made some statements up there acknowledging what had happened down there at the house, and that then their names were coming over the scanner. [The defendant's] name wasn't mentioned in the radio report.

At some point he leaves on foot. Mr. Poe and Ms. Borden leave this house in the car on that and go off down a field road in a pasture down there. By the time the police get all of this information and everything, they go down and they find Mr. Poe and also Ms. Borden down there in this field or pasture or down the road there, so they're taken into custody.

I believe the proof would be that before they left while they were up there at the house, that Mr. Poe had requested and had been provided with some clothes, and that he had changed clothes and taken off the ones that had blood all over them. I believe the proof would be that the police recovered the bloody clothes on that. Some time later, [the defendant] had gone over to a house.

The police had gotten information about his whereabouts and everything, and so he was taken into custody some hours after the initial event. The State's proof with regard to [the defendant] would be that at some point after he was taken into custody he gave a statement to the police, and I'm calling them police, but it's TBI and deputies and everything, but he gave a statement that basically in that statement, he acknowledged that he went down there, and was down there when this happened.

I think in his statement he denies knowing any prior knowledge that there was going to be a homicide committed, that he basically -- I think what he said was there was a fight broke out down there, that he saw Mr. Poe with a knife, and with a hold of Mr. Smith, and he turned his head.

When he looked back, Mr. Smith's laying there with his throat cut. So, they -- and also in his statement he states that Mr. Poe had given him a billfold. He denied getting anything out of the billfold or carrying it away from the scene. I believe his testimony was he laid it on the table or on a stove or something there in the area.

This billfold was never found, or any other items out of the house were never found. So, the State would also call other witnesses that would also testify to any

-3-

conversation they heard them make. There would also be some scientific evidence that would be presented that would substantiate some of the State's theory with regard to some of the things that happened.

When the court inquired of the defendant's counsel whether the defense "stipulate[d] those are the facts," counsel responded, "Yes, sir. That is substantially what [the defendant's] position is." After an exchange between the court and Poe's counsel, the court then put the defendant and Poe under oath and questioned them jointly about their rights. The transcript reveals that, in response to the court's question whether the defendant had been able to discuss his case and possible defenses with his attorney, the defendant answered, "Yes, sir. We discussed it."

Following the plea, a presentence investigation was conducted, and the report generated by that investigation is before us on appeal. From the report, we discern that the defendant is 29 years old, is married, and has two children. He is a graduate of McNairy Central High School, was employed at the time of the offense, and appears to have had a relatively steady employment history, mainly involving manual labor.

At the time of the offense, the defendant had a valid driver's license and no prior criminal history. He advised the presentence investigator that he had been arrested for public drunkenness when he was 18 or 19 years old, but the investigator found no records of any such incident. The defendant self-reported that he had undergone alcohol abuse treatment.

The defendant submitted a lengthy handwritten statement to the presentence investigator, which was included in the report. Obviously, the defendant's statement was not given under oath and was not subject to cross-examination. The defendant's account of what happened reflects, *inter alia*, that he was with Poe and Borden on June 26, 2001. Borden left, went to Smith's residence, and then returned. The defendant heard Borden tell Poe that Smith had tried to rape her. The three individuals drove to Smith's residence, and Poe carried a baseball bat when he got out of the car. Poe and Borden went to the front door. According to the defendant, he was "back at a distance in Mr. Smiths [sic] yard." Borden knocked on the door and when Smith opened the door, Poe hit him with the baseball bat. Poe entered the house and continued to hit Smith. In his statement, the defendant writes:

> While [Poe] was inside hitting Mr. Smith I was still outside. I went in to see what was happening. I went in and [Poe] was beating Mr. Smith. I paniced [sic]. I was scared so I turned around and [Poe] hit him a few more times and the bat broke. [Poe] ran in the kitchen and got a knife and grabbed Mr. Smith by the hair and said f--- with my old lady and I ran for the door and I got to the side door turned around to make sure he wasn't coming after me and he was over Mr. Smith and Mr. Smith was on the floor in a puddle of blood. I ran out back in the woods. . . .

-4-

The defendant then explains that he was able to summon his wife to pick him up, which she did. Later that same morning, officers found the defendant and arrested him. The defendant then writes:

> I did not think [Poe] was going to do nothing to Mr. Smith when he got out the ball bat because I seen him pull that same bat out on Jerry King about 2 days before this happened. He did that because he found Ruby in Jerry Kings [sic] bed naked. He didn't do anything then so I didn't think he was going to do anything to Mr. Smith. The only thing I done to hurt Mr. Smith was I didn't help him. I want the family of Mr. Smith to know this. I paniced [sic]. I got scared and I ran. I had nothing to do with beating or cutting Mr. Smith [sic] throat.

The co-defendant Poe's version of events appears in the presentence report as follows:

> I do not feel I'm guilty of 1th [sic] or 2th drgee [sic] murder, I did kill him but I feel it was manslaughter, my girlfriend told me he tryed [sic] to rape her, but no one would tell the truth, so I took it so I can tell the truth about what happened.

The defendant was sentenced on July 25, 2002. Among the witnesses who testified was the victim's niece, who opined that the defendant "got into this without knowing at the time what he was getting into" and that he "got in with the wrong bunch of people." Billy Ervin, the Sheriff of McNairy County, testified that since the defendant had been taken into custody, there had been no problems and that the Sheriff "[didn't] know of any problems [the defendant had] created."

The defendant's wife testified and explained that at the time of the offense, she and the defendant were separated because of the defendant's alcohol consumption. She was firm, however, that "[t]here was no violence, nothing" and that, even when the defendant drank, he never "bothered" or "harmed" anyone. Her concern was not wanting to see the defendant drink himself to death. Not surprisingly, Ms. Crowe related that she could not believe that the defendant was involved in the victim's death. During discussions with the defendant after his arrest, Ms. Crowe testified that the defendant told her "that he did not do it, that he saw what had happened, and he took off running because he was scared something would happen to him." The defendant's father testified and confirmed that the defendant was not a violent person. His father described the defendant's temperament saying, "He would get mad and walk away before he would hurt someone."

The trial court's sentencing comments were brief: "Regarding Mr. Crowe, the Court finds no enhancement factors and the Court finds as a mitigating factor that he admitted his guilt, and therefore sentences the defendant to 18 years in the Department of Corrections [sic] as a standard offender to serve 30 percent before he's eligible for release classification." Before the judgment of conviction became final, the defendant retained new counsel who filed a written motion to withdraw the defendant's guilty plea to correct a manifest injustice, which was supported by the defendant's affidavit. The affidavit asserted that the defendant did not assist or facilitate the victim's homicide,

his plea was not supported by an adequate factual basis, and his plea was neither knowingly nor voluntarily entered.

The trial court conducted a hearing on October 11, 2002. The defendant testified that he did not understand that facilitation required involvement in the homicide. He said that he told his former counsel that he would plead to facilitation "if it meant I didn't have nothing to do with the murder of Mr. Smith." The defendant made the following statements:

I was there and I seen something I shouldn't have seen, and maybe I should have called the law, but when I got to a phone to where I could have called the law, [Poe], he was right there with me, and I means, you know, after he just killed a man, I'm not going to sit there and pick up a phone and, you know, call the law, you know, with him standing right there with me.

. . . .

. . . See, I am guilty of being there and seeing it, you know, and I thought that's what I was pleading guilty to. And if that's what the time carries just for me being there and seeing it is, you know, then I'm ready to do it. But I didn't have anything to do with the death of Mr. Smith.

On cross-examination, the defendant admitted knowing the harsher punishment that he was facing if convicted of first degree murder as compared to pleading *nolo contendere* to facilitation. He also admitted knowing that his choices were either to plead not guilty and be tried for first degree murder or to plead to facilitation. The defendant, however, insisted that he did not understand the legal concept of facilitation.

The trial court ruled that no manifest injustice had been demonstrated and dismissed the motion to withdraw the plea as not well taken. The trial court stated:

This was a case in which the Court felt like had the case gone to trial that there would have been certainly no question of whether or not Tommy Poe was certainly guilty of first degree murder. It appeared to be a planned, premeditated act on his part. The whole question would have been whether or not [the defendant] would have been criminally responsible for the actions of Tommy Poe. Under that light, it would have certainly been a jury question whether or not he was criminally responsible for the actions of Tommy Poe, or whether or not he facilitated to any substantial degree in the assistance of the commission of the event. Certainly the issue would have been then at that time whether or not they believed the defendant in his statements about his participation. Certainly if it had been a trial he ran the risk of being convicted of either being either criminally responsible for Tommy Poe's action. And if he had, that might have been a facilitation exactly of first degree murder. The Court finds the defendant made a voluntary choice to enter this plea of guilty. There's been no

-6-

new evidence to be presented in this case to show that there's anything unjust about the case, and therefore the petition will be denied.

## Analysis

The defendant contends on appeal that (1) the trial court erred in denying the motion to withdraw his guilty plea, and (2) the sentence imposed by the trial court was excessive. First, the defendant argues that the motion to withdraw his guilty plea should have been granted to prevent "manifest injustice." Specifically, the defendant contends that his plea was "not voluntarily, understandingly, or knowingly entered." We disagree.

We begin with Criminal Procedure Rule 32(f), which addresses the withdrawal of a guilty plea.

> A motion to withdraw a plea of guilty may be made upon a showing by the defendant of any fair and just reason only before sentence is imposed; but to correct manifest injustice, the court after sentence, but before the judgment becomes final, may set aside the judgment of conviction and permit the defendant to withdraw the plea.

Tenn. R. Crim. P. 32(f).

From this rule, numerous principles have been distilled. In general, a defendant who submits a guilty plea is not entitled to withdraw the plea as a matter of right. See State v. Turner, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995); State v. Anderson, 645 S.W.2d 251, 253-54 (Tenn. Crim. App. 1982). A guilty plea, moreover, will not be set aside simply because a defendant experiences a change of heart or is dissatisfied with the punishment ultimately imposed. See Ray v. State, 244 Tenn. 164, 170, 451 S.W.2d 854, 856 (1970). The defendant has the burden of establishing that the plea of guilty should be withdrawn. Turner, 919 S.W.2d at 355. In determining whether the accused has carried this burden, the trial court must determine whether the accused and any witnesses presented to establish this standard are credible. Id. A trial court's decision not to permit a guilty plea to be withdrawn will be affirmed on appeal absent an abuse of discretion. See State v. Davis, 823 S.W.2d 217, 220 (Tenn. Crim. App. 1991). An abuse of discretion occurs if no substantial evidence supports the trial court's conclusion, but when a constitutional violation is shown, the trial court's discretion is "strictly curtailed." Id.

As reflected in Rule 32(f), a trial court may allow a guilty plea to be withdrawn prior to sentencing upon a showing of "any fair and just reason," whereas if the motion is filed after the imposition of sentence but before the judgment becomes final, the more exacting standard of showing "manifest injustice" applies. See Tenn. R. Crim. P. 32(f). "The rationale behind the two standards, depending upon when the defendant's motion to withdraw a guilty plea is filed, is based on 'practical considerations important to the proper administration of justice.'" State v. Patrick Maxwell, No. E1999-00124-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, Oct. 27, 2000) (quoting Kadwell v. United States, 315 F.2d 667, 670 (9th Cir. 1963)). For instance, prior to

sentencing, "the inconvenience to the trial court and the prosecution is usually slight" as compared to an accused's right to have guilt determined by a jury. Id.

It is undisputed that the defendant's Rule 32(f) motion in this case was timely. See State v. Green, 106 S.W.3d 646, 650 (Tenn. 2003) ("[A] judgment of conviction entered upon a guilty plea becomes final thirty days after acceptance of the plea agreement and imposition of sentence."). Likewise, it is settled that a denial of a motion to set aside a guilty plea may be appealed pursuant to Rule 3(b) of the Tennessee Rules of Appellate Procedure and that a trial court retains jurisdiction to rule on a motion to set aside a guilty plea if the motion is filed prior to the date the judgment becomes final. See State v. Peele, 58 S.W.3d 701 (Tenn. 2001). The defendant's motion to withdraw, having been filed after he was sentenced, squarely places before us the issue whether "manifest injustice" has been shown.

The expression "manifest injustice" that appears in Rule 32(f) is not therein defined. In Turner, our court adopted a case-by-case approach to the issue but interpreted "manifest injustice" to include, at a minimum, pleas that were entered as the result of (1) "coercion, fraud, duress or mistake," (2) fear, (3) a "gross misrepresentation" made by the district attorney general, or an assistant," (4) the withholding of material or exculpatory evidence by the State, or (5) when the plea of guilty was "not voluntarily, understandingly, or knowingly entered." Turner, 919 S.W.2d at 355. However, a trial court will not permit withdrawal of a guilty plea to prevent "manifest injustice" based upon (1) "change of heart," (2) an entry of a plea to avoid harsher punishment, and (3) an accused's dissatisfaction with the punishment imposed. Id.

Initially, the defendant claims that his plea was "not voluntarily, understandingly, or knowingly entered," because he did not understand the definition of facilitation. However, we conclude that the record supports the trial court's finding that the plea was entered knowingly and voluntarily. The defendant signed a guilty plea in which he stated several times that he voluntarily entered the plea. In his signed plea agreement he also states that he entered the plea after having been "fully advised by the Court of the crime charged against him" and after having been fully informed of all his rights by his attorney. During the hearing on the plea, the defendant testified under oath that he had both discussed his case and all the possible defenses with his attorney and that he was satisfied with her representation. At the hearing on the motion to withdraw the plea, the defendant testified that he chose to accept the plea, even though he knew he could have decided not to do so. The defendant also testified that he did not understand the definition of facilitation at the time of the entry of the plea and would not have entered the plea if he had known the elements of facilitation. Obviously, the trial court determined that the defendant's accusations were not credible and denied the motion to withdraw the plea. We conclude that the defendant has not shown that the trial court abused its discretion in denying the motion to withdraw.

Additionally, the defendant claims that a sufficient factual basis does not exist to support his guilt for facilitation of first degree murder. Ordinarily, a guilty plea dispenses with the presentation of formal evidence. The trial court, however, must be satisfied that a factual basis for the plea exists, and this requirement is expressly embodied in Criminal Procedure Rule 11, which governs pleas.

Determining Accuracy of Plea. -- Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such a plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.

Tenn. R. Crim. P. 11(f). Indeed, so long as a factual basis for the plea exists, the trial court may accept the plea even though the defendant maintains his or her innocence. See, e.g., Hicks v. State, 983 S.W.2d 240, 247 (Tenn. Crim. App. 1998) (Tennessee recognizes "best interests" plea); State v. Williams, 851 S.W.2d 828, 831 (Tenn. Crim. App. 1992).

The purpose of the factual basis requirement was explained in State v. Lord, 894 S.W.2d 312 (Tenn. Crim. App. 1994).

[T]he requirement that the record show a factual basis for the plea primarily exists to insure [sic] that the defendant's guilty plea is made with his understanding that his admitted conduct actually constitutes the offense with which he is charged or a lesser included one. See McCarthy v. United States, 394 U.S. 459, 466-67, 89 S. Ct. 1166, 1171, 22 L. Ed. 2d 418 (1969). In other words, the factual basis inquiry focuses upon what the defendant understands about the applicable law in relation to the facts he is admitting. Thus, upon the record showing that a guilty plea is voluntarily and understandingly being made, the guilty plea, by itself, is sufficient to support a conviction.

In this respect, the existence of a factual basis may be shown by numerous sources in the record, whether it be a prosecutor's statement of the evidence, live testimony or otherwise.

894 S.W.2d at 316.

According to the State's recitation at the plea submission hearing of what its proof would show, Ms. Borden and Poe instigated the confrontation with Mr. Smith. Ms. Borden was the person who drove the automobile to Mr. Smith's residence, and she knocked on the residence door to summon Mr. Smith. When Mr. Smith opened the door, Poe hit Mr. Smith with a bat. The defendant was mentioned only briefly in the State's factual submission:

The State's proof with regard to [the defendant] would be that at some point after he was taken into custody he gave a statement to the police, and I'm calling them police, but it's TBI and deputies and everything, but he gave a statement that basically in that statement, he acknowledged that he went down there, and was down there when this happened.

I think in his statement he denies knowing any prior knowledge that there was going to be a homicide committed, that he basically -- I think what he said was there

was a fight broke out down there, that he saw Mr. Poe with a knife, and with a hold of Mr. Smith, and he turned his head.

When he looked back, Mr. Smith's laying there with his throat cut. So, they -- and also in his statement he states that Mr. Poe had given him a billfold. He denied getting anything out of the billfold or carrying it away from the scene. I believe his testimony was he laid it on the table or on a stove or something there in the area.

While we agree that the facts set out by the State could have been more detailed with regard to the defendant, we conclude that the defendant has not shown that the trial court abused its discretion in finding that there was a sufficient factual basis for the plea. The State was not required to prove all of the elements of its case at the plea hearing. Had the case gone to trial, it would be up to the jury to determine the facts of the case. In negotiating and accepting the plea agreement, the defendant had agreed to stipulate to the facts underlying the conviction. As this Court has stated in the past, "it is commonly known that the plea-bargain process involves a certain amount of 'give and take' so as to reach a resolution that is acceptable to both the State and the defendant. *Often, this process includes exaggeration or understatement of the facts and circumstances of the offense*." State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999) (emphasis added). We conclude that this issue is without merit.

## II. Sentencing

As part of his appeal, the defendant also complains that the length of the sentence imposed, eighteen years, is excessive and that, if his conviction stands, he should be sentenced to a minimum term of fifteen years, with a thirty percent release eligibility date.

The State argues that the defendant has waived the issue because his judgment of conviction was entered in July 2002 and his notice of appeal was untimely filed in November 2002. The State's argument, in our opinion, is foreclosed by the supreme court's holding in State v. Peele, 58 S.W.3d 701 (Tenn. 2001), that a trial court retains jurisdiction to rule on a motion to set aside a guilty plea if the motion is filed prior to the date the judgment becomes final.

Facilitation of first degree murder is a Class A felony. See Tenn. Code Ann. §§ 39-11-117(a)(1) (first degree murder is one class above Class A), 39-11-403(b) (facilitation is an offense of a class next below the felony facilitated). The sentencing range for a Standard Range I offender convicted of a Class A felony is fifteen to twenty-five years. See id. § 40-35-112(a)(1). The presumptive sentence for a Class A felony is the midpoint of the range, if no enhancement or mitigating factors appear, see id. § 40-35-210(c), which in this instance is twenty years.

The trial court sentenced the defendant to a term of eighteen years, two years below the presumptive midpoint of the range. In so doing, the trial court found no enhancement factors and found as a mitigating factor that the defendant had admitted his guilt. We perceive no basis to

-10-

disturb the trial court's determination. The defendant's claim notwithstanding, our law is settled that a trial court that follows the sentencing principles has discretion to weigh the applicable enhancement and mitigating factors in determining the length of a defendant's sentence. State v. Hayes, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995). The ambit of the trial court's discretion in weighing the factors is sufficiently broad that, if the court follows the pertinent guidelines, we will not disturb the sentence even if we would have preferred a different result. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986).

The defendant advances no persuasive argument why more weight should have been assigned to the sole mitigating factor that the trial court found. Accordingly, we will not quibble with the trial court's weighing of the factor.

## Conclusion

Based on the foregoing reasoning and the record as a whole, we conclude that the defendant has failed to establish that the trial court abused its discretion in denying the motion to withdraw the guilty plea. Additionally, we find no error in the sentence imposed by the trial court. Accordingly, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE