IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 6, 2006 Session

## STATE OF TENNESSEE v. JAMES DONALD HAYNES

**Direct Appeal from the Circuit Court for Henry County**
**No. 13771      Julian P. Guinn, Judge**

---

**No. W2005-02126-CCA-R3-PC  - Filed September 8, 2006**

---

The petitioner, James Donald Haynes, appeals from the post-conviction court's denial of his petition for post-conviction relief.  On appeal, he argues that the post-conviction court erred in finding that he received the effective assistance of counsel and that his guilty plea was knowingly and voluntarily entered.  Following our review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. McLIN, J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined and GARY R. WADE, P.J., not participating.

Jay Norman, Nashville, Tennessee for the petitioner, James Donald Haynes.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; Robert Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**BACKGROUND**

On January 28, 2004, the petitioner pled guilty upon a criminal information to the first-degree murder of Ron Walker and waived his right to grand jury indictment.  The underlying facts of the case as presented by the state at the plea hearing were that:

> [The petitioner] lived in the Broadview community of Henry County, Tennessee, and [the victim] and his family had vacation trailers there or weekend trailers there, also, in this community.  [The petitioner] had a confrontation with [the victim] prior to September the 13th, 2003, that involved [the petitioner's] dog.

At a point in time thereafter, but before September the 13th, 2003, [the petitioner] was given information that his dog was dead. The dog had been shot, and he was given information that [the victim] had shot the dog.

. . . [O]n the afternoon of September the 13th, 2003, the [petitioner] armed himself with a high-caliber revolver. He then went down to the boat ramp in the Broadview community, and he sat at a series of picnic tables waiting for the return of [the victim], who was out in a boat on Kentucky Lake with his brother-in-law, his sister, his daughter and his niece.

During the late afternoon hours, [they] returned to this boat ramp, and they got [sic] a sports utility vehicle, and they began to hoist the boat onto the trailer.

At that point in time, the [petitioner] came up to [the victim] and confronted him about the death of his dog. An argument ensued, and the [petitioner] pulled from his overalls this revolver, stepped back, aimed it, fired it at [the victim], striking him in the chest.

[The victim] was in the process of trying to move away from [the petitioner]. After the first shot in the chest, [the victim] began a spinning movement, basically, alongside the boat. [The petitioner] fired yet again, the second shot striking [the victim] in the back, an approximate back location.

[The victim] had gotten midways down by the boat and, of course, had fallen, and the State maintains, the proof would show, that [the petitioner], armed with this revolver, walked some distance, at least twenty feet, up to [the victim], put the gun to his head, at or near his head, and fired an execution shot into the side of [the victim's] head and then proceeded calmly to walk off up the hill to either his wife's property or his step-son's property.

Subsequently, the police, the Henry County Sheriff's Department, surrounded his trailer, and he did surrender.

The petitioner did not agree with the state's factual recitation, but instead elaborated that:

They brought the boat completely out of the water. I walked from the bench down there to the side of his big Ford, I called it, and I introduced myself. I didn't know the man, but his mother had told me his first name was Ron, and I told him who I was. I said, "Is your name Ron," and he said, "Yes," and he started using the F word. "How did you find out my name?" I said, "Your mother told me."

Okay, I said, "I've got two simple questions to ask you. Did you kill my dog, or do you know who killed my dog?" Now, he's sitting under the driver's steering

wheel with the door closed. Every other word out of his mouth was F. He never once said he did kill my dog or didn't kill my dog, and it got so bad that I told him, "That little girl sitting there," which turned out to be his daughter . . . . I said, "You shouldn't talk like that in front of that little child or that little girl."

The next words out of his mouth and the last words on this earth, "Who the F are you to tell me how to talk?" He came out of his vehicle with what I call a tire thumper, and he proceeded towards me after I had backed up three exact steps and squared my feet to the gravel, and when he started towards me, I pulled my hog leg out and pumped one in his side, turned him about an eighth of a turn. He squared right back up on me and started at me again, and I did what they taught me in the Army to do. I lunged at him.

. . . [H]is sister stood on that boat and watched the whole show. That knocked him . . . on his butt.

From there on, I don't know how it worked, but the gun went off two more times, and he ended up dead.

. . . .

. . . [H]e was sitting . . . on his butt when the last two shots were fired. He was not laying on the ground, and I did not travel twenty feet to execute him. We were together.

The trial court accepted the petitioner's plea and sentenced him to life imprisonment with the possibility of parole. On January 25, 2005, the petitioner filed a petition for post-conviction relief, and later an amended petition. The post-conviction court conducted a hearing on the matter on April 27, 2005, from which we gather the following testimony.

The petitioner's trial counsel testified that on the day he was appointed to represent the petitioner, he and his investigator met with the petitioner for thirty to forty-five minutes. During this meeting, the petitioner relayed his version of the events to counsel, and counsel requested that a forensic evaluation be performed on the petitioner. Counsel testified that he met with the petitioner again for approximately thirty minutes after the forensic evaluation was completed at which time he explained the results of the evaluation and the preliminary hearing process. Counsel recalled that there had been discussions that the district attorney would seek the death penalty but nothing had been filed at that point.

Counsel testified that he met with the petitioner the day before the preliminary hearing, and he again explained what a preliminary hearing consisted of and that the state would call witnesses. Counsel recalled that he also went through the list of potential witnesses. Counsel stated that the petitioner had given a statement to the police. He further stated that he obtained the officers' version

of the petitioner's statement although he did not receive a transcript of the tape. When questioned about whether he verified the officers' account of the petitioner's statement, counsel testified that it was verified by the fact it was basically the same statement the petitioner had given counsel during their first meeting.

Counsel testified that he spoke to the officers who responded to the crime scene prior to the preliminary hearing. He also testified that the investigator informed him as to what the victim's family would testify to even though he was not given hard copies of their statements. Counsel recalled that he cross-examined the victim's family at the preliminary hearing.

Counsel testified that the district attorney did in fact file a notice of intent to seek the death penalty and a request that the petitioner's bond be revoked. However, he could not recall whether the motion to revoke bond was granted. Counsel stated that the factors relied upon in seeking the death penalty were that two or more people could have been harmed as a result of the petitioner's conduct and the heinous nature of the crime. Counsel also recalled that the petitioner had apparently told a Tennessee Bureau of Investigation "TBI" officer and a jailer that there were two other people he would like to "dispose of." Counsel admitted that the notice of intent to seek the death penalty was filed in general sessions court so it was not effective in circuit court.

Counsel testified that he met with the petitioner two more times between the preliminary hearing and the day the petitioner ultimately pled guilty. Counsel stated that during one of those visits the petitioner informed him that he wanted to plead guilty to the charge against him. Counsel said he explained that the grand jury had not heard the case yet, but the petitioner asserted that "he was going to spend the rest of his life in jail. He didn't want to put his wife through . . . all of that, and he simply wanted to go ahead and go to the penitentiary where he could be comfortable."

When asked about whether he discussed enhancement or mitigating factors with the petitioner, counsel stated that they discussed the possibility that it could be a second-degree murder or voluntary manslaughter case, but he did not think it would be a case of self-defense. Counsel stated that he explained to the petitioner that if the case went to the grand jury and if he were indicted that counsel could file motions and a determination would be made as to whether the state would seek the death penalty in circuit court. He admitted that he did not tell the petitioner "of the presumption under Tennessee law as to second-degree murder." Counsel testified that even after he had explained all these things, the petitioner still wanted to plead guilty. Counsel stated that he went over the information, the waiver of presentment and indictment, and the request for a plea with the petitioner.

Counsel testified that he took seriously the possibility that the state was going to seek the death penalty. Prior to the petitioner pleading guilty, counsel discussed the state's petition to seek the death penalty and the petitioner's military background and upbringing with him. Counsel recalled that during this discussion the petitioner said, "from where he was raised you didn't mess with a man's children, grandchildren or their dogs, [but] it was okay with their wives because they were adults, they could take care of themselves." Counsel stated that he talked to the petitioner's

wife about procedural matters, but he did not discuss the petitioner's background or personality with her. In response to questioning regarding whether he conducted any other independent investigation, counsel said "[n]ot in the general sessions level" and the case was only in circuit court the day of the plea.

Counsel testified that he had apprised the petitioner of all the information he had up to the time the petitioner pled guilty and had told him what would happen in circuit court. Counsel admitted he did not give the petitioner a percentage likelihood of conviction of first-degree murder and the lesser-included offenses, but he did tell the petitioner what he thought the judge would charge as lesser-included offenses. According to counsel, the tire thumper the petitioner claimed the victim had was never found, and the victim's family testified at the preliminary hearing that the tire thumper did not exist. Counsel testified that he told the petitioner it would come down to who the jury believed was telling the truth.

Counsel admitted that at the time of the plea he had not received all of the discovery in the case; specifically, he had not received a transcript of the petitioner's statement to police. Counsel testified that he had, however, received everything the investigator had uncovered, which included the ballistics report, the medical examiner's report, the serology report, and TBI Agent Byrd's report. Regarding these reports, counsel stated that he discussed the medical examiner's report with the petitioner, but he did not discuss the serology report. Counsel could not recall whether he discussed the victim's blood alcohol level with the petitioner. Counsel estimated that in all he spent three to four hours talking to the petitioner. Counsel reiterated that he "advised [the petitioner] of his rights. I gave him the benefit of everything that I had. He's the one who stood in front of [the judge] and voluntarily entered the plea."

On cross-examination, counsel testified that the petitioner was very precise and lucid during their interactions. He remembered explaining to the petitioner that the three month time period between the time his dog was killed and when he killed the victim would negate the heat of passion argument necessary for voluntary manslaughter.

The petitioner testified that he could not recall whether counsel told him how long he would have to serve in prison before becoming eligible for parole. He also did not recall counsel talking to him about defenses, but he remembered that counsel's investigator told him that he had no defense. He also stated that counsel never explained the law on self-defense, voluntary manslaughter, or second-degree murder. According to the petitioner, he told counsel he wanted to plead guilty because he was sick and counsel told him not to tell the judge that his health was the reason he was pleading guilty.

The petitioner estimated that counsel spoke to him for approximately ten minutes on the day he was appointed. The petitioner stated that counsel never told him that the district attorney was seeking the death penalty, but instead he found out from a Lieutenant Dycus. He further stated that he could not recall whether counsel explained enhancement or mitigating factors in regards to the death penalty. The petitioner also did not remember counsel discussing his education and military

experience or the results of his mental evaluation. The petitioner did remember counsel asking about his medical condition, but he never obtained any releases.

The petitioner did not recall counsel telling him that pleading guilty was not in his best interest, and he was not provided with any reports, examinations, or discovery materials. The petitioner maintained he never told counsel that he intended to kill the victim the day he went to the boat ramp. The petitioner further maintained that counsel showed no interest in him until he said he wanted to plead guilty. The petitioner said that he perjured himself when the trial court asked if his plea was coerced because he only pled because he was sick and thought he would get better medical care in the Department of Correction.

On cross-examination, the petitioner once again admitted that he perjured himself when the trial court questioned him regarding the voluntariness of his guilty plea.

Following the conclusion of the testimony, the post-conviction court denied the petitioner's request for post-conviction relief. The post-conviction court found that the petitioner received the effective assistance of counsel and knowingly and voluntarily pled guilty.

## STANDARD OF REVIEW

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is de novo with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

## ANALYSIS

On appeal, the petitioner argues two interrelated issues. First, he avers that counsel was so ineffective that his plea was not knowingly entered, and second, that his guilty plea was unknowing and involuntary. Specifically intertwined with his second issue, the petitioner asserts that his plea was unknowing because he disagreed with the factual basis presented by the state.

### I. Ineffective Assistance of Counsel

The petitioner contends that counsel was ineffective in that he "facilitated a plea of guilty . . . and . . . stood silent . . . knowing that he was without the necessary information and investigation to properly advise his client as to his recommendations." When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the petitioner bears the burden of proving (1) that

counsel's performance was deficient, and (2) the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings were fundamentally unfair. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). This standard has also been applied to the right to counsel under Article I, Section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). Should the petitioner fail to establish either element of ineffective assistance of counsel, the petitioner is not entitled to relief. Our supreme court described the standard of review for ineffective assistance of counsel as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

*Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697). When a petitioner claims ineffective assistance of counsel in relation to a guilty plea, the petitioner must prove that counsel performed deficiently, and, but for counsel's errors, the petitioner would not have pled guilty but, instead, would have insisted upon going to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

To begin, we cannot conclude that counsel's performance was deficient in any regard. At the post-conviction hearing, counsel testified to his preparation and investigation of the case. From the testimony, it appears that counsel met with the petitioner on at least four occasions for a total of three to four hours. Counsel testified that he explained that the case could possibly be a second-degree murder or voluntary manslaughter case, and he also explained why the facts did not indicate that the petitioner had been acting in self-defense. Counsel further testified that in addition to the meetings with the petitioner, he met with the investigators and the district attorney and obtained information from those sources. Counsel estimated that at the time the petitioner pled, he had received seventy-five percent of the discovery in the case. Counsel reiterated that it was the petitioner's decision to plead guilty despite the information that counsel had given him. Counsel should not be considered to have performed deficiently for abiding by his client's informed decision to plead guilty. The post-conviction court evaluated both parties' testimony and found that "trial counsel's investigation and preparations were more than ample." Following our review, we determine that the record does not preponderate against the post-conviction court's findings.

## II. Guilty Plea

The petitioner next argues that his plea was not a knowing and voluntary *Alford* plea.[1] When analyzing a guilty plea, we look to the federal standard announced in *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard set out in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977) *superseded on other grounds by* Tennessee Rule of Criminal Procedure 37(b) and Tennessee Rule of Appellate Procedure 3(b). *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). In *Boykin*, the United States Supreme Court held that there must be an affirmative showing by the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. *Boykin*, 395 U.S. at 242. Similarly, our Tennessee Supreme Court in *Mackey* required an affirmative showing of a voluntary and knowing guilty plea; namely, that the defendant has been made aware of the significant consequences of such a plea. *Mackey*, 553 S.W.2d at 340; *see Pettus*, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements or threats. *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he fully understands the plea and its consequences. *Pettus*, 986 S.W.2d at 542; *Blankenship*, 858 S.W.2d at 904. In determining whether a plea is voluntary and intelligent, the court must consider

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship*, 858 S.W.2d at 904 (citations omitted).

The record reflects the following colloquy between the trial court and the petitioner:

> The Court: [Y]ou're before this Court upon what's known as an information that charges you with having committed the crime of murder-in-the-first-degree. The Constitution says that you have an absolute right to have a Grand Jury investigation. A Grand Jury is an independent selected body of thirteen citizens of the county who meet in secret and review the State's evidence, and if they feel that there is a sufficient amount of evidence, they can return an indictment. An indictment is simply a formal written charge.
>
> Your attorney has passed up to me certain papers that indicate that you have waived this right to the Grand Jury investigation and you agree that this case can

---

[1] It appears that the petitioner designates his plea as an *Alford* plea for the first time in his appellate brief, presumably because of his disagreement with the state's recitation of the underlying facts. Such designation, however, will not change our analysis.

bypass the Grand Jury and be brought to this Court upon what's known as an information. The information simply takes the place of the indictment, and you still remain charged with murder-in-the-first-degree. Do you understand that, sir?

[The petitioner]: Yes, sir.

The Court: Is that your desire, that you waive the Grand Jury investigation?

[The petitioner]: Yes, sir.

. . . .

The Court: Has anyone threatened, coerced, harassed or in any manner attempted to force you to plead guilty against your will?

[The petitioner]: Absolutely not.

. . . .

The Court: . . . [H]as anyone threatened you or tried to force you to plead guilty against your will?

[The petitioner]: No. No.

The Court: Do you understand that by pleading guilty here today to this charge, that the sentence that it carries, life in prison, will be imposed?

[The petitioner]: Yes, sir.

The Court: How old are you?

[The petitioner]: Seventy-three.

The Court: It's doubtful that you will ever live the length of time it takes to become eligible for parole. Do you understand that?

[The petitioner]: That doesn't bother me one bit.

. . . .

The Court: . . . [A]re you aware that you do have an absolute right to have a trial?

[The petitioner]: Yes, sir.

. . . .

The Court: This form that you signed and passed up to me waives or gives up this right to this trial I just described to you. Is that what you want to do?

[The petitioner]: Yes, sir. It was plainly explained to me by my lawyer.

. . . .

The Court: All right, sir. Based upon your statement, I understand how this occurred. Do you now plead guilty to murder-in-the-first-degree?

[The petitioner]: Yes, sir, I plead guilty.

In looking at this case, we find no reason to conclude that the petitioner's plea was other than knowing and voluntary. He was possibly facing the death penalty, the alleged "tire thumper" had yet to be recovered, and he was represented by competent counsel who explained the charges and advised him of the possible lesser offenses. Counsel testified that it was the petitioner's choice to plead guilty after counsel provided him with "everything that [he] had at that point in time." Additionally, the above colloquy between the petitioner and the trial court also shows that the petitioner was fully advised of his rights regarding his plea.

Moreover, although the petitioner disagreed with the exact factual basis presented by the state, in the facts recited by the petitioner he admitted to: (1) walking from a bench to the victim's vehicle, while armed; (2) pulling his firearm out "and pump[ing] one in [the victim's] side," upon the victim's coming toward him; (3) lunging at the victim after he shot him the first time; and (4) putting two other shots in the victim while he was on the ground. Even as modified by the petitioner, the facts he admitted constituted at least *a lesser included offense* to first-degree murder. A panel of this court has explained that the "factual basis for the plea primarily exists to insure that the defendant's guilty plea is made with his understanding that his admitted conduct actually constitutes the offense with which he is charged or a lesser included one." *State v. Lord*, 894 S.W.2d 312, 316 (Tenn. Crim. App. 1994). The existence of a factual basis may be shown by numerous sources in the record, such as the prosecutor's statement of the evidence or live testimony. *Chamberlain v. State*, 815 S.W.2d 534, 540 (Tenn. Crim. App. 1990).

Lastly, despite the petitioner's claim that he perjured himself, the record clearly reflects a voluntary and knowing plea. The record shows that when the petitioner entered his plea, he responded "[a]bsolutely not" to the question of whether he was pleading guilty against his will. Furthermore, as the post-conviction court noted, "[t]here is certainly no reason to believe him at this time." In sum, the petitioner has failed to prove by clear and convincing evidence that his guilty plea was unknowing or involuntary; therefore, the judgment of the post-conviction court is affirmed.

**CONCLUSION**

Following our review of the record and the parties' briefs, we affirm the post-conviction court's denial of post-conviction relief.

_____
J.C. McLIN, JUDGE